ROBERTS, J.,
 

 for the Court.
 

 ¶ 1. This suit involves the sale of Lot 17 in The Trace Subdivision (The Trace) in Hattiesburg, Mississippi, whereupon a new home sat that was purchased in 1999 by the Defendants, Rembert and Phyllis Pitts (the Pittses), individually and as guardians for their son, Jason Pitts. The home was built by Barron Hendry. Although he was an experienced builder, Hendry was mistaken about the boundary line between Lot 17 and Lot 16. As a result, the home he built on Lot 17 encroached five feet onto the required ten-foot setback, which was stated in The Trace subdivision covenants. His error also caused the driveway appended to the home to encroach upon Lot 16 of The Trace. Lot 16 was then and at the time of trial owned by David M. Cox, Inc. (Cox, Inc.). The Pittses later built a detached garage directly at the end of the encroaching driveway. The construction of the detached garage took place in the year 2000. Although David Cox (Cox), the developer of The Trace and founder of Cox, Inc., witnessed the construction of the new garage on a daily basis, the garage was completed without any objection from him or any agent of Cox, Inc., until a new survey of Lot 16 was taken in 2004. Cox, Inc., through its attorney, noticed the Pittses that they would have to remove the detached garage. Thereafter, when the Pittses did not remove the garage, Cox, Inc., filed suit against the Pittses seeking to have the garage removed and the driveway repositioned. Finding Cox, Inc., to be the more responsible party and the party with superior knowledge, the chancellor ordered Cox, Inc., to convey title of the affected portion of Lot 16 to the Pittses in exchange for the highest stated market value. We affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. On February 5, 1999, the Pittses purchased a home for $180,000 from Hen-dry via a warranty deed. The home is located on Lot 17 in The Trace, which is a platted subdivision in Lamar County, Mississippi developed by Cox, Inc. The neighborhood is naturally hilly, with creeks and lakes and some wetlands, and it has approximately 200 lots. Hendry, a long-time acquaintance and business affiliate of Cox, purchased Lot 17 in order to build a “spec home” in the new development. Cox and Hendry had a personal and business relationship that spanned twenty-five years.
 

 ¶ 3. In order to begin construction, Hen-dry and a co-worker located four stakes, which were placed on the four corners of the property, and “pulled a string” from corner to corner in order to establish the perimeter of Lot 17. Hendry testified that he did not obtain an independent survey of the property because the method he used to identify the perimeter of the property was standard procedure, especially in new developments; Cox had recently had the property surveyed; and there were four stakes in the corners of the lot with Lot 17 written on them.
 
 [1]
 
 Hendry’s deposition testimony was corroborated by the sworn
 
 *798
 
 testimony of Johnny Gatwood. Gatwood helped Hendry build the home, and he was present at the time Hendry located the stakes and “pulled the string” to establish the perimeter of the property. Echoing Hendry’s testimony, Gatwood testified that this practice was standard procedure. He also testified that had they not located four stakes indicating the property corners, they would not have proceeded any further. Gatwood testified that Hendry was diligent to personally locate the stakes and establish the perimeter of property before beginning any construction, in order to avoid mistakes such as those that have occurred in the instant case.
 

 ¶ 4. Hendry testified that Cox drove past the home’s construction site regularly, and he often stopped to chat. Although Cox testified that he did not “meddle” in Hendry’s or any contractors’ business, Hendry testified that there was no doubt that Cox was aware of where the new home was being placed on Lot 17. After completion of the home, Hendry listed the home for sale with Cox, Inc., which was also a real estate business. Sherry Cox Underwood, who is the daughter of Cox and the vice-president of Cox, Inc., acted as the a dual agent for Hendry and the Pittses in the sale/purchase of the home situated on Lot 17. Underwood was also the listing agent for the Pittses’ home on Lexington Drive in Hattiesburg, which was the home they lived in prior to the purchase of the home in The Trace. The Pittses’ new home purchase was contingent upon the home having special accommodations for their disabled son and receiving approval by the chancery court. Their son, Jason, had been in a vegetative state since he was involved in a car accident when he was nine years old; he was twenty-three at the time of the trial. Hen-dry retrofitted the new construction in order to equip the home with the appropriate accommodations. The home in The Trace was purchased primarily with settlement money held by the Pittses as guardians for their physically and mentally incapacitated son, Jason. However, the detached garage was financed solely with personal funds of the Pittses.
 

 ¶ 5. At trial, Rembert testified that he had placed complete confidence in Underwood, and that he and his wife, Phyllis, “thought the world of her and still [does].” He explained that Underwood “seemed very compassionate about Jason ... [and] [she] was very touched and very professional about wanting to handle the things and help [them].” Rembert testified that in the early stages of the home’s purchase, he informed Undeiwood that he was placing his trust in her by asking her “[w]hat have we got to do?” Rembert also testified that, based upon the way Underwood handled herself, they had “no reservations in trusting her because she [was] very confident, very knowledgeable, and very professional acting.” He explained that they and Underwood went over a “punch list of expenses,” and he testified that when they got to the item of “survey” on the list, he asked if they needed one. He testified that he was asking this out of concern for their financial situation, given that their financial situation was “taxing.” He stated that he wanted to make sure that they would be able to fund everything related to the home’s purchase. Rembert testified that Underwood replied, “daddy owns the subdivision. It’s a platted subdivision. And[,] there would be no need for a survey. He’s the only owner, and it went straight to Mr. Hendry.... [Y]ou could really get by without that because he is the original owner.... I know that because David Cox is my daddy.” Rembert’s testimony was substantiated by Hendry. When asked about the events at the real estate closing, Hendry testified as follows:
 

 
 *799
 
 Everything was going smoothly; well, it did go smooth. [Rembert] asked for a termite.
 
 [2]
 
 He said, do we have a survey [?] I had the termite that I gave him. I said, I did not survey, nobody asked for one. It was discussed and the lady from [D]eposit Guaranty said they didn’t need one. I said, I did the house according to the survey that was there, and [Rembert] agreed. He said, I trust you and Mr. Cox both. So that is where we left that, and I believe [Underwood] said, Dad has done a many one or something to that effect.
 

 (Footnote added).
 

 ¶ 6. Rembert testified that during the final walk-through before closing, at which the Pittses, Hendry, and Underwood were present, as he stood on the driveway on the left side of the house, he asked Underwood to show him how far over to the left of the driveway did the side yard go. According to Rembert, Underwood pointed to a thicket of trees located about fifteen feet from the driveway, and she said that was about where the property line was. Rem-bert testified that he was satisfied with her information, and that “[he] [just] wanted to know about a general direction.” At one point during the hearing, Underwood testified that she did not recall standing on the driveway and answering questions about the property line. However at another point during the hearing, she appeared to remember being on the driveway, but she did not recall directing Rembert to the approximate location of the property line. Be that as it may, she also testified that she had participated in or had been the closing agent in over 150 transactions involving lots sold in The Trace, and that it would be fair to say that she did not remember all the representations that she had made to her clients regarding those lots.
 

 ¶ 7. Not long after moving into their new home in The Trace, the Pittses realized that they needed additional garage space in order to house two of their cars because they needed their handicap-equipped vehicle to be more readily accessible when their son needed to be transported to his doctors’ appointments or to the hospital. Rembert testified that he initially called Underwood to inquire about locating a contractor and having a garage built, and she directed him to her father, Cox, because besides being a highly successful developer, he was also a builder. Rembert stated that Cox came to his home, discussed the anticipated garage, saw where Rembert was planning on locating it, and reminded Rembert that he would need to comply with the neighborhood covenants. Rembert stated that he assured Cox that the garage would be done by the same architect, and that the brick, shingles, and roof line would match the existing home, thereby complying with the covenants. Cox, Inc., argues that the intention of Cox in referring the Pittses to the covenants was so that they would be in compliance with the ten-foot setback requirements for the side yard. However, Rembert testified that the inference from the conversation was that the garage must match the architeetui’al design of the existing home.
 

 ¶ 8. Cox also reminded Rembert that the pi’oject would need to be submitted to The Trace’s architectural committee. In 2000, the year that the garage was built, the architectural committee was comprised of Cox, Underwood, and Cox’s partner, Mr. Eavenson. Underwood testified that the Pittses never submitted anything to the committee, but she also testified that her father never told the Pittses that they needed to present their plans to the committee. Regardless of whether or not the
 
 *800
 
 Pittses officially submitted the garage plans to the committee, it is clear from the record that two of the three members of the architectural committee passed by the site where the garage was being constructed on a daily basis from its inception.
 
 [3]
 
 In fact, testimony revealed that Cox passed by several times per day during the construction of the garage.
 

 ¶ 9. Ultimately, Cox declined to build the garage because the job was too small, so he referred the Pittses to his son-in-law, Buddy Yawn. Yawn met with Rembert, and he was shown where the garage was to be constructed. Yawn quoted Rembert a price of $15,000 to build the garage. Cox, Inc., contends that Yawn informed the Pittses that the proposed site for the garage may have been inappropriate, yet Underwood also testified that if her brother-in-law recognized that a structure was going to result in a lot-line problem, he would have informed her. She then testified that Yawn did not go to her to discuss a potential lot-line problem regarding the Pittses’ garage. Yawn did not build the Pittses’ garage. According to Yawn’s testimony, he was too busy with other jobs and did not want to get “stressed out.” Ultimately, Randall Pittman, an acquaintance of the Pittses, built the garage.
 

 ¶ 10. On the morning the garage foundation was poured, it was a frigid twenty-nine degrees, and Rembert had reservations about Pittman pouring the concrete. Both Rembert and Pittman testified that Cox stopped by the site, saw what was happening, and reassured Rembert that it would be fine to go ahead and pour the garage foundation. He assured Rembert that: he had poured many foundations in such cold weather; the temperature was supposed to warm up that day; and it would be fine. Pittman testified that Rembert appeared to have more confidence in what Cox told him that what Pittman told him. It is apparent that the Pittses relied on Cox’s advice. It is clear from the record, at the time Cox was there that morning, the footings were established for the garage; Cox passed by the construction site (the Pittses’ home) every day, as Cox himself lived in The Trace; and Cox knew from the beginning where the detached garage was going to be located. Just because Cox may not have “meddled” in a contractor’s business does not negate the fact that he was acutely aware of what was transpiring and where the Pittses’ garage was being built.
 

 ¶ 11. In consideration of future construction, Cox, Inc., had Joel Ford survey Lot 16 in March 2004. Cox, Inc., avers that it was at that time when it first became aware of the encroachment onto Lot 16. Five years after the Pittses’ home was built and four years after the garage was built, Cox, Inc., filed suit on October 14, 2004, in the Chancery Court of Lamar County requesting that the Pittses be required to remove the encroaching portion of the driveway, which Hendry constructed, as well as the detached garage. This change would have resulted in the original garage opening being moved from the side of the house to the front of the house. After the dispute began, Hendry attempted to purchase Lot 16 from Cox, Inc., at the market price of $30,000 in order to sell or give at least part of it to the Pittses and remedy the situation. Obviously not amenable to a peaceful resolution of the conflict, Cox refused to sell the property to Hendry after he learned what Hendry intended to do with Lot 16. Hendry testified that when he told Cox what he intended to do with the lot, Cox replied, “I am sorry that you are caught up in it, but I
 
 *801
 
 am going to make that man tear that building down.”
 
 [4]
 

 ¶ 12. The case went to trial on the second amended complaint of Cox, Inc. The Pittses filed a counterclaim against Cox, Inc., a third-party complaint against Hendry, and a third-party complaint against Underwood. Finding that no party was without fault, the chancellor determined that the equitable solution was for Cox, Inc., to sell the portion of Lot 16 on which part of the Pittses’ driveway and the garage was situated, including a three-foot access area to the building on its back side and its southern side, and for Cox, Inc., to execute and deliver an effective waiver of any violation of the building-setback requirement resulting from construction of the Pittses’ dwelling and/or related improvements. The Pittses were ordered to pay Cox, Inc., the sum of $3,465. This sum was calculated by multiplying a market value of $55,000 by 0.063%, which represented the effected area of Lot 16. The $55,000 figure represented the highest value for Lot 16, as stated by Underwood. Aggrieved by the chancellor’s ruling, Cox, Inc., filed this appeal.
 

 STANDARD OF REVIEW
 

 ¶ 13. “On review, we generally defer to a chancery court’s findings of fact unless [the findings] are manifestly wrong or clearly erroneous. We use a de novo standard of review when examining questions of law decided by a chancery court.”
 
 Bailey v. Estate of Kemp,
 
 955 So.2d 777, 781 (¶ 15) (Miss.2007) (internal citation omitted).
 

 DISCUSSION
 

 ¶ 14. Cox, Inc., raises one issue on appeal, and it is: Whether the chancellor exceeded his authority, granted relief contrary to law, and abused his discretion in failing to order the removal of the encroachments onto Lot 16, which was owned by Cox, Inc., and in ordering Cox, Inc., to convey title to a portion of Cox, Inc.’s Lot 16 to the Pittses. The record has copious amounts of exhibits and testimony, and at first blush, it may appear complicated. However, after a complete reading of the record, we find that the chancellor was correct in treating this boundary dispute as a mutual mistake between the parties, which compounded into a series of errors. We find that the chancellor’s final judgment provides an equitable remedy and was supported by substantial evidence and reasonable in light of the unusual facts and circumstances of this case.
 
 See Henry v. Moore,
 
 9 So.3d 1146, 1156(¶ 29) (Miss.Ct.App.2008).
 

 ¶ 15. The supreme court has stated the general rule regarding property
 
 *802
 
 rights and the granting of injunctions as follows:
 

 The general rule is that a landowner is entitled to an injunction directing the removal of a trespassing structure on his land erected thereon by the owner of adjoining land. The facts that the aggrieved owner suffers little or no damage from the trespass, that the wrongdoer acted in good faith and would be put to disproportionate expense by removal of the trespassing structures, and that neighborly conduct as well as business judgment would require acceptance of compensation in money for the land appropriated, are ordinarily no reasons for denying an injunction. Rights in real property cannot ordinarily be taken from the owner at a valuation, except under the power of eminent domain.
 
 Only when there is some estoppel or laches on the part of the plaintiff, or a refusal on his part to consent to acts necessary to the removal or abatement which he demands, will an injunction ordinarily be refused.
 

 Shuttles v. Field, Brackett & Pitts, Inc.,
 
 261 So.2d 795, 797-98 (Miss.1972) (citation omitted) (emphasis added). “The authorities agree that every case of equitable estoppel must rest on the particular facts involved.”
 
 Bright v. Michel,
 
 242 Miss. 738, 749, 137 So.2d 155, 159 (1962). Although the Pittses did not affirmatively plead equitable estoppel in their answer, Mississippi Rules of Civil Procedure 15(b) states, in part, “[wjhen issues not raised by the pleadings are tried by expressed or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.” We find that the record is replete with “particular” facts that reverberate with the tenets of equitable estoppel. Accordingly, they are sufficient to support the chancellor’s finding.
 

 ¶ 16. After hearing two and one-half days of testimony by the parties and other witnesses, as well as having Cox’s and Hendry’s depositions before him, the chancellor found that “[o]f the principal parties who were in this transaction, namely David M. Cox, Barron Hendry, Sherry Cox Underwood and Rembert Pitts, only the latter, Pitts, was a novice and virtually without experience in matters of this nature involving construction in developing areas and subdivisions.” The chancellor opined that although “neither of the parties was without fault,” Cox and Underwood, as officers of the corporation and the “movers and shakers” of The Trace, should have known with reasonable certainty the location of the lot line involved. The chancellor was also persuaded by the fact that both Cox and Undeiwood passed by the property on a daily basis, passing by several times per day on some days. The chancellor’s decision is supported by well-settled case law. The supreme court has stated that:
 

 If the owner of land with full knowledge, or with sufficient notice or means of knowledge, of his rights and of all the material facts, knowingly, though passively, looks on while another person expends money on the land under an erroneous opinion of title, it would be an injustice to permit the owner to exercise his legal rights against such other person. The owner is bound by the doctrine of equitable estoppel.
 

 Id.
 
 at 749, 137 So.2d. at 159 (citations omitted).
 

 ¶ 17. The Pittses purchased a newly constructed home from Hendry, who was a long-time business associate and friend of Cox. As an experienced builder, Hendry relied upon the stakes that marked the boundaries of Lots 16 and 17 and built the home that the Pittses purchased from him. Cox, Inc., now argues that Hendry should
 
 *803
 
 have at least used a tape measure and verified that the perimeter he marked correlated to the measurements on the subdivision plat. Yet, Underwood testified that she also had identified stakes and “pulled a string” to establish the boundaries on lots before building homes, and that she too had experienced the same type lot-line or property-line errors. Howevei*, in those instances, Cox, Inc., simply made a company decision to adjust the boundary lines to remedy the situation. The record supports the chancellor’s finding that it was simply a series of errors among all of the parties that led to the encroachment onto Lot 16.
 

 ¶ 18. The Pittses relied upon Underwood, who was a real estate agent and broker, the daughter of Cox, and the vice-president of Cox, Inc. As the chancellor noted, under the principles of agency law, if she were going to speak of the property’s boundaries, Underwood owed a duty to the Pittses to accurately state the facts concerning the boundary lines. If she was unsure, she had a duty to verify the lot line before relating her opinion to the Pittses. The instant case truly involves an unfortunate series of errors, and it would have been wholly inequitable for the chancellor to have rendered a ruling that resulted in the Pittses, the novices involved, to be the only parties required to pay for the consequences of those errors.
 

 ¶ 19. Underwood testified that she did not recall a discussion that took place between her and Rembert at the final walk through prior to closing. Conversely, Rembert testified that during the final walk through, at which Hendry was also present, he asked Underwood where his property line was, and she responded that it was about fifteen feet past the end of the driveway toward Lot 16. He averred that she referred to that side of the yard as the “short side.” Although at trial she claimed to have no recollection of referring to that side of the yard as the “short side,” Rem-bert testified that he had specifically asked her how far the property went because she had told him to remember that the side of the house with the driveway was on was the “short side” of the property.
 

 ¶ 20. The record supports the chancellor’s acceptance of Rembert’s testimony concerning the events that took place shortly before the closing on the property. To recap, from the time the home was completed, before the Pittses ever became involved, there was a violation of the setback requirements in The Trace’s covenants, and a portion of the driveway encroached upon Lot 16. Underwood, who was a shareholder of Cox, Inc., and was intimately involved in the development of The Trace from its inception, acted as the dual agent for Hendry and the Pittses. Her own testimony established that she, as a broker/salesperson had a duty to know the boundaries of the property and to inform the clients, which were the Pittses in the instant case, where the boundary lines were located. However, she did not. Also, Cox, Inc., was then and at the time of trial, the owner of Lot 16, yet it remained silent throughout all of the building processes that took place on its property. Moreover, not only did the Pittses rely on Underwood’s representation of where the lot line was located and the lack of need for a survey, they also relied on Hendry’s representation and the advice they received from the bank. Although we recognize that it would be a safer practice for the purchasers of real property to obtain an independent survey, we find that it was reasonable for the purchaser of a new home in a new subdivision, who was being represented by the developer’s daughter and an agent of the development corporation, to rely upon the assertions made to him or her. It was not unreasonable for the Pittses to trust that their new home, as
 
 *804
 
 well as its driveway, was properly situated on the lot. It was also not unreasonable for them to believe that the land
 
 directly
 
 at the end of their driveway was part of their property. It goes against reason to think that a property owner in the Pittses’ position would expend $15,000 on a garage, or any other structure in a neighborhood, if they did not believe that it was on their lot. Furthermore, Cox, Inc., waited four years after the garage was built before it pursued any recourse against the Pittses. Yet, even in light of all these factors, the chancellor crafted a remedy that provided compensation for Cox, Inc., and did not allow the Pittses to escape from the situation unscathed.
 

 ¶ 21. Although the chancellor found that Cox and Underwood were at greater fault, he did not excuse the Pittses from all responsibility, and he refused to grant the Pittses the relief they requested. The Pittses wanted the court to simply deny Cox, Inc., any relief and command Cox, Inc., to purchase their property at its full market value and additionally make the Pittses whole with respect to costs incurred by them in the defense of Cox, Inc.’s action. Or, in the alternative, the Pittses requested that Cox, Inc., be required to deed to them an appropriate strip of land from Lot 16 that would include the totality of the improvements constructed by them. However, in seeking an equitable conclusion to the dispute, the chancellor disagreed.
 

 ¶ 22. The chancellor opined that “the [c]ourt was not persuaded that ... it never dawned on [Rembert] that [he] was off his lot and onto Cox’s lot 16 until ... March 2004.... ” The chancellor based his opinion on the fact that the Pittses’ lot was approximately one hundred twenty feet wide, and their home was seventy feet wide. The chancellor recognized that “it [was] an indisputable fact that [the Pittses] ha[d] encroached substantially upon property belonging to Cox, Inc.” The learned chancellor determined that the appropriate solution and remedy of this dispute was “not to be found in the confines of statutes ... but rather in the somewhat broad expanse of powers of the ... [chancery] [c]ourt as the court of equity, the court of conscience.” Finding that the chancellor’s ruling was not against the overwhelming weight of the evidence, we agree.
 

 ¶ 23. The supreme court has held: Where the Chancellor was the trier of facts, his findings of fact on conflicting evidence cannot be disturbed by this Court on appeal unless we can say with reasonable certainty that these findings were manifestly wrong and against the overwhelming weight of the evidence. Even if this Court disagreed with the lower court on the finding of fact and might have arrived at a different conclusion, we are still bound by the [Chancellor's findings unless manifestly wrong.
 

 In re Extension and Enlarging of Boundaries of the City of Laurel, Mississippi,
 
 922 So.2d 791, 795(¶6) (Miss.2006) (quoting
 
 Richardson v. Riley,
 
 355 So.2d 667, 668 (Miss.1978)). The supreme court went on to say that:
 

 The Chancellor’s role as fact finder parallels that of a juror.... [A]s [the] sole judge [ ] of the facts in this case, [he] determine[d] what weight and what credibility [would] be assigned the testimony and supporting evidence of each witness in this case. [He][was] required to use ... good common sense and sound, honest judgment in considering and weighing the testimony of each witness. A Chancellor is afforded the favor of observing the demeanor of witnesses and he is called upon to exercise his discretion, as we similarly mandate jurors .... [T]his Court held, the credibility of the witnesses and the weight of
 
 *805
 
 their testimony, as well as the interpretation of evidence where it is capable of more than one reasonable interpretation, are primarily for the chancellor as the trier of facts. [It was] further stated that if the issue is one of fact, the Chancellor’s decision
 
 will not be disturbed unless it is manifestly ivrong.
 
 As with any finder of fact, he is entitled to consider the interests witnesses may have in the outcome.
 

 Id.
 
 at 795-96 (¶ 7) (Miss.2006) (internal citations and quotations omitted) (emphasis added).
 

 ¶ 24. Cox, Inc., argues that
 
 Turner v. Moms,
 
 196 Miss. 297, 17 So.2d 205 (1944) controls and that “[r]emoval of the encroachment is the proper remedy to avoid severe damages to Cox, Inc.” We agree that
 
 Turner
 
 is applicable, but we find that
 
 Turner
 
 does not automatically mandate the removal of an encroaching structure. The holding of
 
 Turner
 
 should not be viewed without considering other case law and equitable principles. The Pitts family actively relied upon the representations by Cox, Inc., and Underwood as experienced real estate developers. Moreover, Underwood was not only the Pittses’ agent, but she was also the agent of Cox, Inc., — the developer of the neighborhood. Nothing indicates any ill will or bad intent on the part of the Pittses, and the evidence clearly indicates that Cox and Underwood
 
 actively participated
 
 in the events surrounding the sale of the Pittses’ home and later the construction of the garage, which was placed
 
 directly
 
 at the end of the driveway.
 

 ¶ 25. We are cognizant that
 
 “[ofnly when there is some estoppel or laches on the part of the plaintiff, or a refusal on his part to consent to acts necessary to the removal or abatement which he demands, will an injunction ordinarily be refused.” Shattles,
 
 261 So.2d at 798 (citation omitted) (emphasis added). And, we are not remiss in remembering that “[t]he ownership of property and the right to have it protected in the courts is so deeply embedded in the law that the denial of such right is always a matter of grave concern to the courts.”
 
 Bright,
 
 242 Miss, at 750, 137 So.2d. at 159. Furthermore, we are aware that “[t]he application of the doctrine of equitable estoppel in cases of this kind deny that right, and the doctrine should be applied cautiously and
 
 only token
 
 equity clearly requires it [to] be done.”
 
 Id.
 
 at 750, 137 So.2d. at 159 (emphasis added). However, we find that the chancellor was correct in applying the doctrine of equitable estoppel. The
 
 Bright
 
 plaintiffs were active participants in the construction of the encroaching structure by selling the property to the defendants and by providing, or selling, the materials that were needed for the construction.
 
 Id.
 
 at 745-46, 137 So.2d at 157-58. Like the plaintiffs in
 
 Bright,
 
 Cox and Underwood knew what the defendants were doing, “and no direct assertion was made that the [defendants] were encroaching.”
 
 Id.
 
 at 746, 137 So.2d at 158.
 
 Bright
 
 is analogous to the instant case.
 

 ¶ 26. Furthermore, not only was Cox, Inc., an integral part of the decisions made by the Pittses, there was also “refusal on [Cox’s] part to consent to acts necessary to the removal or abatement which he demanded].... ”
 
 Shattles,
 
 261 So.2d at 798 (citation omitted). It is unclear to this Court why Cox dug in his heels and refused to accept an amicable resolution to this dispute, but it is clear that he adamantly refused, not only a reasonable offer for Lot 16, but the exact price which he previously had requested, simply because it would have allowed the Pittses to maintain their garage. The chancellor was correct when he stated in his opinion that “he who seeks equity must do equity.” We adhere to the principle that:
 

 
 *806
 
 [A] mandatory injunction is an extraordinary remedial process which courts are more reluctant to grant than a prohibitory one.
 
 Ordinarily a mandatory injunction ivill not issue if adequate redress is afforded at law, and is never issued except in extreme cases; and such injunction is a rather harsh remedial process not regarded with judicial favor.
 

 Id.
 
 at 797 (citation omitted) (emphasis added).
 

 ¶ 27. We disagree with Cox, Inc.’s contention that Cox, Inc., would suffer greater harm if the Pittses were allowed to maintain their garage. Cox, Inc., maintains that the relief it requested would only cost the Pittses $8,000. However, this figure only addresses the cost estimate given by Hendry to reposition the driveway and make the initial garage attached to the home a front opening garage rather than a side opening garage. This view does not take into account all of the factors that should be considered. First, this does not address the fact that the Pittses specifically chose a home with a side opening garage, not a front opening garage. Cox, Inc.’s argument that the majority of the homes in The Trace have front opening garages, is unavailing. And, second, it does not address the loss of the $15,000 detached garage, which is at the heart of this dispute.
 

 ¶ 28. Furthermore, the chancellor’s ruling does not “eviscerate” Lot 16, as Cox, Inc., claims. Underwood testified that a home could be built on Lot 16. Indeed, she testified that she has over one hundred house plans at her disposal, which have been used in The Trace development, from which a home can be built on the property. Therefore, the chancellor’s decision does not render the lot unusable. Also, we disagree with Cox, Inc.’s assertion that the chancellor’s decision equates to a taking of Cox, Inc.’s property. Cox, Inc., was, and appears to remain, in the business of selling lots in The Trace. Indeed, Cox would have sold Lot 16 to Hendry had Hendry not intended to find an amicable resolution to the dispute. The chancellor’s ruling will allow Cox, Inc., to be compensated for its property and allow a dwelling to be constructed on the residential property. We find that the chancellor wisely contemplated the rights and concerns of each party and ruled accordingly.
 

 CONCLUSION
 

 ¶ 29. Just as the unique facts in
 
 Bright
 
 prevented the chancellor from finding it equitable to grant the injunctive relief which was sought, “[i]n this case the chancellor’s opinion shows that his conscience [also] rebelled against allowing [the Appellant] to insist on [its] legal rights under the circumstances.”
 
 Bright,
 
 242 Miss, at 750, 137 So.2d at
 
 159.
 
 Based upon the foregoing reasons, we find the chancellor’s decision was fully supported and justified by the evidence.
 
 Id.
 

 ¶ 30. THE JUDGMENT OF THE LAMAR COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO T1IE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ, IRVING, GRIFFIS, BARNES, ISHEE, CARLTON AND MAXWELL, JJ., CONCUR.
 

 [1]
 

 . Both Hendry and Cox were diagnosed with incurable cancer before trial, and each had a prognosis that they would not survive for a prolonged period of time. Therefore, their testimonies were obtained by deposition for trial purposes. Their testimonies were available for the court to consider.
 

 [2]
 

 . We assume Hendry was referring to a ler-mite bond on the properly.
 

 [3]
 

 . Underwood also testified that there was never any written documentation appointing an "official” committee; rather, it was simply understood in the company.
 

 [4]
 

 . Perhaps Cox’s insistence upon making the Pittses tear down their garage rather than selling Lot 16 at the market price, which he had quoted to Hendry, was because Rembert reported Cox's fill work on Lot 16 to the "wetland folks.” Presumably, the "wetland folks” is the Environmental Protection Agency. When asked if Cox had any involvement with the "wetland folks” because of his fill work on Lot 16, Cox replied: "Yes. I had to get a permit on it. Mr. Pitts called every agency in this country, from the health department to [the] Corps of Engineers, and I had to get a permit to finish doing the site work on [LotJ 16, yes.” It appears that Cox, Inc., was required to purchase other wetland property located in Jackson County for $25,000 in lieu of a penalty for the work that was taking place on Lot 16. Both Underwood and Cox testified to this effect. Underwood testified that Lot 16 had a drainage easement on it because water naturally drained down one side of the lot. She testified that in spite of the natural drainage on the lot, it was still a "buildable" lot. Also, at some time after the dispute arose, Cox was arrested after a trespassing incident on or near the Pittses’ property. As may happen in lawsuits, ill feelings developed between the parties.