RANDOLPH, Presiding Justice,
for the Court:
¶ 1. Perry and Lori Elchos (the Elchos-es) purchased a 1.11 acre (more or less) parcel of a fifty-acre tract of largely undeveloped land located near and on the Jour-dan River in Hancock County near Kiln, Mississippi, from Kevin and Lisa Haas (the Haases) in 2004. The Elchoses proceeded to construct a house partially on property the Haases did not sell or convey to the Elchoses. After an unsuccessful attempt to resolve the dispute, the Haases sued, claiming the Elchoses were trespassing and violating restrictive covenants to which they had agreed at the time of the sale and conveyance. The Elchoses answered and claimed, inter alia, that the dispute resulted from a mutual mistake and that the Haases’ claims were barred by the doctrines nf estoppel and laches. After receiving evidence and testimony at trial, the chancellor found that the Elchos-es, who had received a deed, complete with an attached property description' and survey, knew or should have known the boundaries of the property they had pm> chased. The chancellor further found that the Haases were without knowledge of the encroachment until December 2007. Thus, he decreed that the Elchoses should move the structure off of the Haases’ property and onto the property the Elchoses purchased. Aggrieved, the Elchoses appealed the chancellor’s judgment to this Court. We. affirm. '
STANDARD OF REVIEW
¶2. “[A] chancellor’s findings of fact are unassailable on appeal unless those .findings are manifestly wrong.” McCoy v. McCoy, 611 So.2d 957, 960 (Miss.1992). In David M. Cox, Inc. v. Pitts, the court held that:
Where the Chancellor was the trier of facts, his findings of fact on conflicting evidence cannot be disturbed by this Court on appeal unless we can say with reasonable certainty that these findings were manifestly wrong and against the overwhelming weight of the evidence. Even if this Court disagreed with the lower court on the finding of fact and might have arrived at a different conclusion, we are still bound by the [Cjhancel-lor’s findings unless manifestly wrong. The Chancellor’s role as fact finder parallels that of a juror.[A]s [the] sole judge .[] of the facts in this case, [he] determine[d] what weight and what credibility [would] be assigned the testimony and .supporting evidence of each witness in this case. [He][was] required to use ... good common sense and sound, honest judgment in considering and weighing the testimony of each wit *1187 ness. A Chancellor is afforded the favor of observing the demeanor of witnesses and he is called upon, to exercise his discretion, as we similarly mandate jurors .... [T]his Court held, the credibility of the witnesses- and the weight of their testimony, as well as the interpretation of evidence where at is capable of more than one reasonable interpretation, are primarily for the chancellor as the trier of facts. [It was] further stated that if the issue is one of fact, the Chancellor’s decision will not be disturbed unless it is manifestly wrong. • As with any finder of fact, he is entitled to conr sider the interests witnesses may have in the outcome.
David M. Cox, Inc. v. Pitts, 29 So.3d 795, 804-05 (Miss.Ct.App.2009) (quoting In re Extension and Enlarging of Boundaries of the City of Laurel, Miss., 922 So.2d 791, 795 (Miss.2006) (quoting Richardson v. Riley, 355 So.2d 667, 668 (Miss.1978))) (internal citations omitted).
¶ 3. Our appellate review is considered in the light most favorable' to the party who found favor in the chancellor’s ruling. Bright v. Michel, 242 Miss. 738, 743, 137 So.2d 155 (Miss.1962). If conflicting testimony is presented, all testimony favoring the Haases iliust be accepted, along with all permissible inferences which the chancellor could draw from the proof and circumstances, becoming established facts. Id. All attempts to seek application of estoppel and laches require intense factual analysis, and each case must be judged separately. Bright, 242 Miss. at 749; Pitts, 29 So.3d at 802.
¶ 4. A fact-intensive analysis is inherent in examining the defenses of mutual mistake, estoppel, and laches. Given the legal standard of great deference afforded to á chancellor’s findings, we examine the record to ensure sufficient evidence supports his findings. .A chancellor’s findings shall not be disturbed absent manifest error. See Bright, 242 Miss. at 749; Pitts, 29 So.3d at 802.
PACTS
KEVIN HAAS'. '
• ¶ 5. Kevin Haas purchased fifty-plus acres, from which he sold a 1.1-acre parcel to the Elehoses. The parties entered into a sales contract .on March 4, 2004, contingent upon Haas providing Elchos a survey. Sidney Fournet conducted a survey on April 20,2004. Haas provided Elchos with the survey by handing it to him in-person prior to the May 2004 closing.
- ¶ 6. Haas and Elchos viewed the property prior to consummation of the sale. Haas ..,. showed [Elchos] about where his lot would be.”- The property was “grown-up” and there were, “stakes everywhere.” He did not show Elchos any particular stakes because he .did not know which stakes were for which parcels. Because of this uncertainty, it was agreed for a survey to be conducted prior to closing. The executed sales contract provided, “[s]ale is: subject to purchaser’s approval of survey results. Purchaser may rescind contract if survey is not acceptable to purchaser.” On cross-examination, Haas testified he went'to the property1 with the Elehoses and with a real estate agent, Stephan Haas,[1] who contacted him on their behalf. The visit to the property was before the March 12, -2004, contract was signed. Haas reiterated that he did not know the exact boundaries of the parcels, so he showed the Elehoses “where [their] lot was about located.” Haas further stated that he still did not know exactly where the lot was located, and he did not know the exact boundaries of the lot until it was *1188 discovered that the Elchoses’ structure had been built on the -wrong lot, which was ultimately confirmed by a 2008 survey.
¶ 7. Haas explained how the larger tract was divided, using exhibits admitted at trial. Haas’s sister, Gina Larsen, owned the easternmost parcel of the fifty-plus-acre property, a campsite on the Jourdan River. Another campsite, adjoined immediately west, was owned by his brother, Stephen Haas. The Haases later sold the parcel immediately west of Stephen’s property to the Sheffields. The undeveloped Sheffield parcel was labeled as Kevin Haas’s parcel on the exhibits and lies between Stephen’s parcel (on the east) and Kevin and Lisa Haas’s .97-acre parcel (on the west).: - Testimony was undisputed that the .97-acre parcel was being held for Haas’s cousin, Cletus.' Haas sold the “waterfront- property” to the Sheffields for $250,000. Haas explained that their .97-acre parcel is- a 100-foot-wide parcel, immediately wést of the Sheffields’ parcel. The Elchoses’ property is also a 100-foot-wide parcel, and it lies immediately west of the Haases’ .97-acre parcel.
¶8. Haas’s activity on the. fifty-plus acres of undeveloped property was minimal during the time in which the Elchos structure was being built. He acknowledged that he did pass on a gravel road leading by.the Elchos property to get to his ■ own property. Exhibits reveal the gravel road was situated on a fifty-foot-wide ingress/egress perpetual easement. The gravel road runs west to east, north of the contested properties. The Elchoses’ driveway enters, the gravel road at the northwestern edge of the property they purchased, totally within the property they purchased. Another exhibit reveals that the northernmost corner of the structure was 156.6 feet south of the southernmost boundary of the gravel road.
¶ 9. Haas acknowledged that a trucking company he owned delivered three or four loads of fill dirt to the Elchoses. A company employee, not Haas, made the deliveries. He also testified that the Elchoses’ roof blew off during ■ Hurricane Katrina and Haas pushed the roof up to the road for FEMA pick-up. Also, at Elchos’s request, Haas had' used a piece of his heavy equipment to straighten the structure “wracked” during Katrina. Haas testified that he was-totally unaware that the structure was built on the wrong property until years later, Haas stated that he never saw Elchos placing t-posts on the property, nor did he ever see string connecting t-posts when he was on the property following Katrina, ■ The t-posts were not present when he was clearing the aftermath of Hurricane Katrina. Haas testified that he saw the foundation- from a distance when it was being formed but did not know the foundation was partially on his property.
¶ 10. Haas first became aware of the encroachment when Elchos called Haas to inform him that the lots were “messed up.” Haas responded that the lots could not be “messed up” because they were certified by two different companies. Fournet, a surveyor, was present with Elchos and got on the phone. Fournet ■ told Haas that “the lots are not messed up. Mr. Elchos built three-quarters of his house, on your property.” Thereafter, the April 2008 survey was performed and confirmed the encroachment.
■ ¶ 11. The Elchoses’ structure is angled to provide a view of the Jourdan River, but the rectangular plot abuts a pond, once used to hold logs. Haas testified that Elchos said that he turned the structure to face the river. Haas explained that’s how he “messed up” and “got cross ways on the line.” ■ Haas explained that the Sheffield property, Stephen’s property, and Gina’s property are all on the river, but the prop *1189 erties west of the Sheffield property are all on and face the log pond.
SIDNEY FOURNET, SURVEYOR
¶ 12. Sidney Fournet affirmed that, when he referenced the survey of April 2004, he divided the lots west of the present Sheffield (then Kevin and Lisa Haas) property. He also prepared the 2008 survey, which exhibits the Elchoses’ driveway beginning at the easement road on the correct lot, but that the Elchoses had built across the lot lines. He further affirmed that the property description in the deed to the Elchoses’ property matches the survey. Before the 2004 survey, the only permanent markers were those that outlined the entire fifty-plus-acre property. At the time he performed the>2004 survey, he marked the lots using eighteen-inch, half-inch rebar. He stated that he first saw imposts in 2008 .when he resuryeyed the property. Fournet testified that “it looks like the wrong pins [were] used to stake the house.” He explained that, in his opinion, the Elchoses used the wrong front pins, using the (southern) front pins 100 feet to the east of the front pins marking thpir lot. The front pins were identified as the pins near the log pond. Fournet provided that no competent, knowledgeable surveyor would lay out the Elchos lot as shown by the blue lines on exhibit six, which the Elchoses claim is their lot.[2]
KELLY KING
¶ 13. Kelly King, who laid the foundation for the Elchos structure, testified that Elchos showed him four steel pipes (pins) and instructed him that those pipes outlined his -property. King testified that he did not recall seeing any t-posts or string marking the property lines. King further testified that he, not Elchos, pulled string to connect the four pipes Elchos showed him. King testified that Elchos did not provide him with a survey. He testified that Elchos wanted his property as close to the water as possible. He also stated that Haas showed him where an elevation point was, but he did so on other Haas-owned property, and that he ■ had never seen Haas on the Elchoses’ property when he laid out and constructed the Elchos foundation. ■
STEPHAN HAAS, REAL ESTATE AGENT
¶ 14. Stephan Haas was a real estate agent for the Elchoses. He set up a meeting with Elchos, Kevin Haas, and himself. Stephan provided that there were no markers or property lines indicating where the lots were located at the time of the first meeting., Stephan stated that Kevin Haas had. explained how the easternmost parcel was his sister’s; then moving immediately west, was his brother’s parcel; then Kevin and Lisa Haas’s own parcel (now the Sheffields’). All were located on the Jourdan River. Stephan testified that they were looking at property on the log-pond area and did not walk.over to the river-front property. Stephan explained that Elchos had stated that he wanted the easternmost lot on the log pond, but that Kevin Haas told him that lot, “the first lot,” was being held for his cousin, Cletus. Kevin Haas told Elchos he could purchase the lot immediately west of the lot he was holding for his cousin. Stephan said they also looked at additional westward lots on the log pond, but returned to “the second lot,” which was located immediately west of the first lot. ' Stephan stated that El-chos wanted to purchase the first lot because “you get a better view,” since there is a bend in the river.
*1190 ¶ 15. Stephan reiterated there was no doubt in his mind that Kevin Haas had explained to Elehos that he would be purchasing the second lot on the log pond, because the first lot was being reserved for Cletus and was not for sale at any price. His testimony also provided that a survey would have to be finished before he could sell the property. He went on to explain that the lack of a survey is why the sales contract stated that Elehos would be purchasing the lot 100 feet west of Kevin Haas’s property. Stephan also provided it was clear that the lot the Elchoses were purchasing was the second lot on the log pond. He further stated that Kevin Haas had explicitly -said the lots would run straight up and down.
PERRY'ELCHOS
¶ 16. Perry Elehos testified that he and Stephan Haas met Kevin Haas' at the southeast corner of the first lot bn the log pond and that they proceeded to walk west on the water’s edge. Elehos stated that there were a few physical 'markers, but that “they were" scattered ... [and] you couldn’t really tell what was what.” He also stated that most of the visible markers were on the northern edge of the property because the water’s edge was overgrown and not visible. He provided that there were no flags, fence posts, etc., marking any corners of the property.
¶ 17. Elehos went on to testify that “they were selling us lot 2, a hundred feet west of Kevin’s!.]” He further provided that he was not shown any markers on the day that he signed the sales contract, nor did he walk the entire property. He stated that he wanted the provision in the sales contract which required a survey because he knew that there were other lots close by, one of which was being saved for Haas’s cousin, and that he did not know where lot 2 was in relation to anything. Pie reiterated that he- would not close on the property until the survey was,.completed.
¶ 18. Elehos said he met Kevin Haas at the property a second time. He stated that they began by'finding the northeastern-most pin and began walking westward until they reached an artesian well (marked on an exhibit by Elehos). Elehos stated that Haas had told him that the well was Plaas’s and that Elehos could not have that first lot. They continued walking west to the next lot, which was for sale. Elehos said he wanted to purchase that lot. Elehos then'laid they “walked straight down from the middle of the lot” to the pin at the southernmost edge of the property. He testified that he went back to the property later (after closing), and marked what he believed to be his property using t-posts and'pulled-string, without reference to or reliance on the survey.'
¶ 19. Elehos’s testimony regarding Haas’s knowledge was equivocal. He said he did not believe that Haas knew where the lots were.. He later said that “[Haas] knew' where my lot was.” Of particular significance, he testified that Haas did not know that Elehos was building on the wrong lot.
LORI ELCHOS
¶20. Lon Elehos testified she was present when Haas showed them the lot. They “stood in the area of the lot” close to the water’s edge by the log pond. She did not recall any markings on the property at that time.
TRIAL COURT’S FINDINGS AND ' FURTHER PROCEEDINGS
¶ 21. The chancellor found: (1) that the Elchoses received a survey prior to the sale, as was stipulated in the sales contract; (2) that “said survey was attached to the Deed . -.. (3) that in March 2005, the *1191 Elchoses began construction .partially on their property and partially on ,the Haas property; .(4) that the Haases did not discover the encroachment until December 2007; (5) that the Elchoses knew;, or should have known, that they were building partially on,their property and partially on the Haases’, property; (6) that the Haases had met their burden of proof; and (7) “.., that the evidence sustains a finding of gross negligence, thereby justifying an assessment of, attorney feed”
■ ¶22. The chancellor ordered the El-choses to move the house off of the Haas-es’ property within 120 days and to abide by and obey the covenants contained in their deed.[3] The chancellor awarded the Haases one dollar in damages for the El-choses’ trespass and ordered the Elchoses to pay $15,928.75 to cover the costs of the Haases’ attorney’s fees. All of the Elchos-es’ counterclaims were.- dismissed with prejudice. The Elchoses appealed.[4]
ANALYSIS
1. Whether the chancery court erred by failing to reform the Elchoses’ deed because both the Elchoses and the Haases were mutually mistaken with regard to the property conveyed.
¶ 23. It is outside the purview of this Court’s authority to reweigh eyidence, Pitts, 29 So.3d at 894-05, We are to accept the chancellor’s findings of facts and ensure.that those findings are supported by the evidence that was before him. Id. In today’s case, the chancellor’s findings are supported by the record before us.
¶24. “The right of persons to contract is fundamental to our jurisprudence and absent mutual mistake, fraud and/or illegality, the courts do not have the authority to modify, add to, or subtract from the terms of a contract validly executed between two parties.” Wallace v. United Miss. Bank, 726 So.2d 578, 584 (Miss.1998) (quoting First Nat’l Bank of Vicksburg v. Caruthers, 443 So.2d 861, 864 (Miss.1983)). Deed disputes are examined under principles analogous-to contracts. See Peoples Bank & Trust Co. v. Nettleton Fox Hunting & Fishing Ass’n, 672 So.2d 1235 (Miss.1996). “[A] person is under an obligation to read a contract before signing it, and will not'as a general rule be heard to complain of an oral misrepresentation the error of which would have been disclosed by reading the contract.” Godfrey, Bassett & Kuykendall Architects, Ltd. v. Huntington Lumber & Supply Co., Inc., 584 So.2d 1254, 1257 (Miss.1991).
 ¶ 25. “In an action to reform a deed based on a mistake theory, the petitioner must demonstrate, a mutual mistake among the parties or a unilateral mistake *1192 in combination -with fraud or inequitable conduct on the part of the benefitting party.” McCoy, 611 So.2d at 961. The burden rests with the petitioner to “prove the mutual mistake occurred between the parties beyond a reasonable doubt” Id. (emphasis added). A mutual mistake is defined as “[a] mistake that is shared and relied on by both /parties to a contract.” Mutual mistake, Black’s Law Dictionary (10th ed.2014) (emphasis added).
¶ 26. The chancellor was presented with testimony over three days. The sales contract stated, “owner is purchasing lot 2, which is 100 feet west of Kevin and Lisa. Haas’s riverfront lot.” The surveys and testimony presented at trial reveal that the Elchoses’ structure encroaches upon lot 1 (property that he wanted to buy but was refused), and lot 2 (the property he contracted to purchase and for which he received a deed and survey, properly described). Not a single exhibit or witness’s testimony undermines the fact that lot 2 began 100 feet west of Kevin Haas’s property (currently the Sheffields’). Elchos conceded that the property with the arte-sian well (lot 1) was not for sale. Elchos ensured that the sale was contingent upon receipt of a survey so that he could be certain where lot 2 was located, before closing.’ A survey^was provided to Elchos and revealed that lot 2 begins 100 feet west .of Kevin Haas’s property. It is undisputed that the deed matches the survey Elchos was given. Elchos agreed to the sales contract, contingent upon receipt of the survey.. Elchos then closed on the property upon presentation of the survey and deed. All three documents describe the same parcel.
¶ 27. Evidence in the record dispels mutual mistake, as found by the chancellor. The Elchoses failed to carry their burden of establishing beyond a reasonable doubt that a mutual mistake occurred. The' chancellor determined that the mistake was made by the Elchoses (unilaterally). The record reveals no proof of fraud or inequitable conduct by the Haases. Facts to support the chancellor’s rejection of the claim of mutual mistake are clearly in the record before us. After hearing testimony from >the parties and from disinterested witnesses, the chancellor rejected any notion that a mistake was shared by both parties, but found rather that the Elchoses’ negligence caused the dilemma.[5] The chancellor found that the Elchoses were bound to the property description contained in the warranty deed and survey. He found that the -parties were bound by the terms of their contract. The chancellor cited Turner v. Morris, 196 Miss. 297, 17 So.2d 205, 207 (1944) (“... the appellees must be charged with knowing that their deed gave them no right to encroach on the appellant’s land[.]”), and that, by examining the deed, the Elchoses would haye known which property to build on and that they were building on the wrong property.
¶ 28. The final judgment reads, “Mr. and Mrs. Haas have fully met their burden of proof and their Complaint for Mandatory Injunction should be fully sustained[.]” In cases such as this, the genéral rule of law is well-established:
The general rule is that a landowner is entitled to an injunction directing the *1193 removal of a trespassing structure on his land erected thereon by the owner of adjoining land. The facts that the aggrieved owner suffers little or no damage from the trespass, that the wrongdoer acted in good faith and would be put to disproportionate expense by removal of the trespassing structures, and that neighborly conduct as well as. business judgment would require acceptance of compensation in money for the land appropriated, are ordinarily no reasons for denying an injunction. Rights in real property cannot ordinarily be taken from the owner.at a valuation, except under the power of eminent domain. Only when there is some estoppel or laches on the part of the plaintiff, or a refusal on his part to consent to acts necessary to the removal or abatement which he demands, will an injunction ordinarily be refused.
Shattles v. Field, Brackett & Pitts, Inc., 261 So.2d 795, 797-98 (Miss.1972). See also Residential Advantage Dev., LLC v. Executor, Adm’rs, Devisees, Beneficiaries, & Assigns of Heirs-at-law of Dwight Tyrone Ross, 136 So.3d 476, 480 (Miss.Ct.App.2014). The evidence supports the decision of the chancellor not to reform the deed.
2. Whether the Haases’ claim of title is barred by estoppel and/or lach-es.
¶ 29. The record lacks evidentiary support for the application of estoppel or lach-es, affirmative defenses to the Haases’ claim of trespass. The Elchoses failed to meet their burden to support these defens: es. See Christian Methodist Episcopal Church v. S & S Constr. Co., 615 So.2d 568, 571 (Miss.1993). The Elchoses not only failed to sustain their mutual-mistake claim, but they further failed to offer sufficient evidence to support the defense of estoppel and/or laches.
¶ 30, “The defense of laches applies when one party neglects to assert a right or claim, and such neglect, when taken together with any lapses of time and other circumstances causing prejudice to the adverse party,- operates as a bar in a court of equity.” Bailey v. Estate of Kemp, 955 So.2d 777, 784 (Miss.2007).
The general rule is that a landowner is entitled to an injunction .directing the removal of a trespassing structure on his land erected thereon ■ by the owner of adjoining land .... “ ‘Only when there is some estoppel or laches on the part of the plaintiff, or- a refusal on -his part to consent to acts necessary to the-removal or abatement which he demands will an ■ injunction ordinarily be refused.’ ”
Turner, 17 So.2d at 207 (citations omitted). “The party seeking to invoke the doctrine of laches must show: (1) [the .existence of a] delay in asserting a right or .claim, (2) [that] the delay was not excusable, and (3) [that] there was undue prejudice to the party against whom the claim [was] asserted.” Miss. Dep’t of Human Servs. v. Molden, 644 So.2d 1230, 1233 (Miss.1994). Stated another way, the test is whether a party “induce[d] another to act to his prejudice.” Perrien v. Mapp, 374 So.2d 794, 797 (Miss.1979). No evidence was presented that Haas induced Elchos to act to his prejudice. The issue of laches is left to the sound discretion of the chancellor, “and his decision will not be overturned on appeal except where .there is an abuse of discretion.” Id.
■ ¶ 31. As to estoppel,
The rule of equity is, that if one man knowingly, though he does it passively by looking on, suffers another to purchase, and expend his money on land, under an erroneous opinion of title, without making known his claim, he should not afterwards be permitted to exercise his legal right against such person. It *1194 would be an act of fraud and injustice, and his conscience is bound by an equitable estoppel..
Bright, 137 So.2d at 159. The factors that must be proven are knowledge and passivity that another is expending money On the land under an “erroneous opinion of title.” Id.; Nixon’s Heirs v. Carco’s Heirs, 28 Miss. 414 (Miss.Err. & App.1854). The record reflects the Elchoses established neither in their ease at trial. Perry El-chos’s own testimony defeats the defense. (See supra If 19). The chancellor cited only Turner,- which we will address along with Bright and Pitts, where equitable es-toppel was applied.
¶ 32. Turner concerned a two-foot strip of commercial/residential property ' in downtown Hattiesburg. The buyer had a perpetual easement to build a stairway on the strip leading down to the basement of his building. Turner, 17 So.2d at 206. Buyer built a stairwell, with & sustaining wall, running the entire height of his three-story building. Id. The court held, regardless of whether a sustaining wall was allowed to accompany any stairway into the basement, the deed “clearly does not confer on them the right to construct a stairway on this strip' of land leading from its surface to the upper floors of [Buyer’s] building.” Id.
¶ 33. Buyer claimed Seller ■ was es-topped from objecting to the encroachment because Seller knew of the encroachment when the building was being erected and made no objection. Id. at 207. Some evidence showed Buyer frequently passed by the building, yet the court found that even if true, “it falls short of proof that the [Buyer] realized from what he saw- when he was at or passing this building that it was being constructed so as to encroach on his land.” Id. (emphasis added). The court held this lack of realization (lack of knowledge) alone was enough to prevent the application of estoppel, and then went on to say that it need, not express an opinion whether the Buyer’s knowledge of the deed alone would prevent the application-of estoppel in the event Seller knew of the encroachment without objecting. Id.
¶34. Bright provides an excellent example of whén to apply the affirmative defense of • estoppel/laches. Bright' concerned a five-foot strip of land in the town of Hickory Flat. Bright owned land north of an unnamed road and a five-foot strip west óf that road. Bright, 137 So.2d at 156-57. Years later,- the same person who sold' the land to the Brights also sold land to the Michels,' immediately west of the land- sold to the Brights. Id. at 157. Bright was present'at the sale and encouraged the transaction — he even assisted in measuring the tract and referred to the lot the Michels were purchasing as a “corner lot.” Id. The Michels constructed a concrete gutter encroaching on the five-foot strip; Bright personally sold to the Mi-chels the materials to build the gutter. Id. The Michels built a café and motel, also encroaching on the strip of property, and. they bought all the materials from the Brights; the -Brights even loaned the Mi-chels. money for the projects. Id. Most importantly, Bright stated it looked like to him that Michels was “getting over the line;” Id. The Brights “constantly used the- driveway” constructed on the unnamed street and running adjacent to the five-foot strip while the Michels were building on the five-foot strip, but nothing further was said about any encroachment until the Brights and the Michels had a falling out. Id. at 157-58.
¶ 35. When the Brights -later sued the Michels seeking an injunction for the removal of the offending structures, the judge denied them relief under the doctrine of estoppel. Id. at 158. The Brights “were unconcerned whether the Michels *1195 were encroaching on the Bright property[,3” they “sold all the materials for the construction which encroached,”. and the Brights “observed the encroachments being built.”[6] Id. at 159. The Brights knew the Michels were building on their property and watched as they continued to expend money in improvements; the Brights even encouraged the improvements by selling the materials and loaning money. Because the requisite elements of knowledge and passivity were met, the Brights were estopped from asserting their right to an injunction. See also Martin v. Franklin, 245 So.2d 602 (Miss.1971) (finding a landowner who lived across the street from site where another 'party was building a home on the landowner’s property in full view of the landowner estopped from asserting his' right to an injunction). In Martin, “the chancellor found that Martin simply waited until the house was finished before he made his claim of ownership.”[7] Id. at 604. Without any aid of additional survey or research, on the day the contractor completed building the house, as he “was putting the lock on the front door,” Martin went up to the contractor and asked, “Do you know you are building a house on my land?” M
¶86. More recently, the Court of Appeals held that equity required the sale of disputed land where the Pittses built a garage on property owned by David M. Cox,.Inc., rather than granting Cox’s requested injunction, Pitts, 29 So.3d at 804. Cox owned a subdivision, in which it had sold a lot to Hendry, who built a house and driveway- on the property. Id. at 797. Hendry: built the driveway partially on an adjacent lot owned by Cox. Id. Hendry sold his lot to the Pittses-, who later built a detached garage at the end of the driveway; as such, the garage also encroached on Cox’s lot. Id. Cox’s daughter (the vice-president of David M. Cox, Inc.) acted as the dual agent for both Hendry and the Pittses. Id. at 798. Cox’s daughter informed the Pittses there was no need for a survey and that their property extended about fifteen feet beyond the driveway. Id. at 798-99. The Pittses built their garage, at the end of the driveway, within where they were told their property lay. Id. Cox himself told the Pittses it was okay for them to pour their, foundation in the location they, staked-out and passed right by the construction site in the subdivision “every day.” Id. at 800. When the encroachment was discovered, Hendry attempted to buy the adjoining lot from Cox for the price Cox quoted: $30,000. Id. When Hendry informed Cox he intended to sell the Pittses the portion on which their garage was sitting, Cox refused to sell.[8] Id.
¶37. Finding no party without fault, but that the Pittses were the only non-experienced party (Cox being a real-estate developer, his daughter .a real-estate agent, and Hendry an experienced builder), the chancellor determined equity required Cox to sell the portion of the adjoining lot on which the Pittses’ garage encroached and for. the Pittses to pay the highest market value available for the property. /A at 801-80. The Court of Appeals affirmed due to Cox’s knowledge *1196 that the structure was being built on his property (he and his daughter passed by and saw it every day) and passivity in failing to assert his right (Cox and his agent-daughter even aided in the construction by informing the Pittses that their land extended beyond the driveway and that the foundation was in a proper location). Id. at 803-06.
¶ 38. A review of our caselaw and a review of the evidence offered at trial fails to support application of the defenses of estoppel and/or laches. In his judgment, the chancellor found a critical fact which defeats the affirmative defense of estoppel and laches: the Haases did not learn of the encroachment until December 2007 and complained immediately. We have held that “every case of equitable estoppel must rest on the particular facts involved.” Bright, 137 So.2d at 159. Here, Elchos testified that Haas did not know that Elchos was' building on the wrong lot. Here, the chancellor rejected the Elchoses’ claims that Haas passively sat by with knowledge that Elchos was building a structure on his lot. The chancellor was presented with substantial evidence of the very opposite, a good portion coming from disinterested witnesses. Throughout his testimony, Elchos stated that' Haas did not know where the lot was. All testimony -supported that Haas was surprised when he learned that the El-choses’ structure was on his lot. Knowledge aside (constructive or otherwise), the evidence provides no support that Haas passively looked on, suffering the Elchoses to expend money on land owned by Haas. Estoppel requires proof of both knowledge and passivity — essential elements which the Elchoses failed to establish.
¶ 39. Although a Bright/Pitts analysis by the chancellor would have been beneficial, his failure to cite those cases does not prevent our resolution of this case. The facts of those cases are readily distinguishable from the record in this case, and the proof offered for the existence of either estoppel or laches is nonexistent.
¶ 40. This case involves a small parcel of land out of a fifty-plus acre tract of relatively undeveloped, land. Bright and Pitts concerned, narrow strips of land in developed areas-a dedicated street intersecting U.S. Highway 78 in the Town of Hickory Flat and a 200-lot platted subdivision, The Trace in Lamar County, respectively. In Bright and Pitts, the parties seeking injunctions knew exactly where the construction was taking place and actively participated in and encouraged the building of the encroaching structure. Haas did not know the Elchoses were building on Haas’s property because of overgrowth and the distance from the gravel road to the site. The only component in close proximity to the road was the entrance to the Elchoses’driveway, which was on the northeastern corner of the lot they purchased. Haas never told Elchos the foundation or structure was properly located. Haas did not live next door or across the street, he did not pass by or see the construction every day, and he did not announce his claim to the property as soon as construction was completed. Nor did Haas espouse any belief that the Elchoses were encroaching on his land while simultaneously acquiescing to any encroachment. He asserted his right as soon as he whs informed the Elchoses had built on his property and sought appropriate relief.
¶ 41. Haas unequivocally stated that he had no knowledge that the Elchos-es were on his property. Elchos agreed. Accordingly, the record supports the chancellor’s finding that the Haases’ claims were not barred. “[T]he doctrine [of equitable estoppel] should be applied cautiously and only when equity clearly requires it *1197 be done.” Bright, 137 So.2d at 159. Here, the doctrine does not apply.
3. Whether the chancery court erred in dismissing the Elchoses’ counterclaims of negligent misrepresentation, breach of contract, and intentional misrepresentation.
,¶ 42. The chancery court dismissed the Elchoses’ counterclaims with prejudice. On appeal, the Elchoses seek reversal of the chancellor’s judgment, arguing that Haas negligently misrepresented the location of the Elchoses’ lot, that Haas breached a purported contract with the Elchoses to provide amenities (water, sewer, and power) and to pave an entrance road to the property, and that Haas intentionally misrepresented to the Elchoses that they were purchasing a lot in a subdivision and those amenities (water, sewer, and power) would be provided.
¶43. To establish a claim of negligent misrepresentation, the party asserting the claim must prove) by a. preponderance of the evidence, the following elements;
(1) a misrepresentation or omission of a fact; (2) that the representation or omission is material or significant; (3) that the person/entity charged with the negligence failed to exercise that degree of diligence and expertise the public is entitled to expect of such persons/entities; (4) that the plaintiff reasonably relied upon the misrepresentation or omission; and (5) that the plaintiff suffered damages as a direct or proximate result of such reasonable reliance.
Holland v. Peoples Bank and Trust, 3 So.3d 94, 101 (Miss.2008). We cannot say based on a review of the record that Haas was negligent to the extent that he “failed to exercise that degree of diligence and expertise the public is entitled to expect” of persons conveying property. See id. A survey of the land conveyed was, in fact, provided. The Elchoses never established reasonable reliance on Haas’s purported misrepresentation regarding the location of their lot; In their counterclaim, the Elchoses asserted that they “suffered damages as a direct and proximate result of such reasonable reliance” and that they thereby “are entitled to recover all damages resulting from the negligent misrepresentation,” but no evidence of reasonable reliance and/or damages was forthcoming. We hold that the chancellor did not err as a matter of law by dismissing the Elchos-es’ negligent-misrepresentation claim.
¶44. The Elchoses also claim that Haas breached the sales contract by failing to provide water, sewer, and power, though those amenities were to be expected in a subdivision. Also, the Elchoses claim that Haas breached the contract by failing to pave an entrance road on the property. Mississippi Code Section Í5 — 3— 1(c) (Rev.2012) bars any action concerning contracts for the sale of land “unless ... the promise or agreement upon which such action may be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith_” This Court has held that “[t]he principal purpose of the Statute of Frauds ... is to require the contracting parties to reduce to writing the specific terms of their contract, especially an agreement affecting lands for more than one year, and thus to avoid dependence on the imperfect memory of the contracting parties, after-the passage of time, as to what they actually agreed to some time in the past.” Sharpsburg Farms, Inc. v. Williams, 363 So.2d 1350, 1354 (Miss.1978). No writing memorialized the purported contract alleged by the Elchoses to have been breached. The contract of sale was silent regarding the provision of water, sewer, and power to the Elchoses’ lot.
*1198 ¶ 45. Stephan Haas testified that, while no representations were made with regard to power, as to' “sewer and water, there were representations-made.” Those representations, were initially memorialized in the sales contract, but roughly four days prior to closing, the Elchoses “called [Stephan] up and said they wanted those taken out.” Apparently, “Mr. Elchos said ,:he didn’t care about the water and sewage because he was going to run a sewage that sprinkled on the property_” The El-choses ■ cannot complain now about something they asked to be removed from the contract. ■
¶ 46. While Elchos did not “care about the water and sewage,” according to Stephan, “he did care about paving,” which was stated in the final writing as follows: “[closing attorney shall holcl $25,000 in escrow after closing to be dispersed to owner at the time of completion of paying unnamed entrance road to property.” While Elchos claimed not to know that the $25,000 was being released to Haas at closing, the Settlement Statement was signed by both Perry and Lori Elchos and belies their claim. The Settlement Statement reflected that the $25,000, characterized as “Deposit or earnest money,” was to be released to the seller. Because their contentions are without merit, we affirm the chancellor’s dismissal of the Elchoses’ breach-of-contract claim,
¶ 47. Lastly, the Elchoses counterclaimed that Haas’s purported statements regarding provision of water, sewer, and power amounted to an intentional or fraudulent misrepresentation. According to this Court, a plaintiff asserting .fraudulent misrepresentation must prove the following elements, by clear and convincing evidence:
(1) a representation; (2) its falsity; (8) its materiality; (4) the speaker’s knowledge of its falsity or ignorance of the truth; (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated; (6) the hearer’s Ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury.
Holland, 3 So.3d at 100. But the facts presented at trial simply do not rise to the required level of culpability on the Haases’ part to support the Elchoses’ claim of intentional or fraudulent misrepresentation. No evidence in the record supports the claim that Haas intentionally made statements to the Elchoses in order to induce them to purchase the property. Additionally, as with their claim of negligent misrepresentation, the Elchoses failed to present evidence regarding precisely how they were injured, consequently or proximately, by Haas’s purported misrepresentations.
¶48, The chancellor did not err as a matter of law by dismissing the ’Elchoses’ counterclaims with prejudice, since their counterclaims are without factual support in the record. Consequently, we affirm the dismissal of all of the Elchoses’ counterclaims.
4. Whether the chancery court erred in awarding attorney’s fees to the Haases.
¶49. "Both parties requested attorney’s fees at trial. The chancellor entered judgment in favor of the Haases for attorney’s fees, amounting to $15,928.75. The Elchoses assert on appeal that “Haas was awarded attorney’s fees and costs as a result of the very Covenants he provided to the Elchoses” and that the chancellor erred as a matter of law in granting the award. The Haases claim the award was warranted, since the Elchoses were guilty of “gross negligence” and violated the protective covenants in the deed.
*1199 ¶ 50. “[T]he matter of determining attorney’s-fees ,.. is largely entrusted to the discretion of the chancellor.” A.M.L. v. J.W.L., 98 So.3d 1001, 1022 (Miss.2012). “The standard of review regarding attorneys’ fees is the abuse of discretion standard, and such awards must be supported by credible evidence.” Bailey v. Estate of Kemp, 955 So.2d 777, 787 (Miss.2007).
¶ 51. In awarding attorney’s fees to the Haases, the chancellor found that the evidence supported a finding of gross negligence on the part of the Elchoses in building them home partially on the Haases’ property even though they were provided with a proper survey and deed fully describing the property they in fact bought and that was intended to be conveyed. Evidence in the record supports this award and we cannot say the chancellor abused his discretion in so awarding.
CONCLUSION
¶ 52. The Elchoses knowingly bought lot 2. The Haases knowingly sold lot 2.‘ When the Elchoses built their home par-, tially on lot 1 and partially on lot 2 — in contravention of the deed description and. survey — there was no mutual mistake as to where the property line was or what property was sold, so the chancellor properly refused to reform the deed. ..The’ Haases did not know the Elchoses had built on their property until 2007, so neither estop-pel nor laches acted to bar them, from asserting their claims. The chancellor did not err in dismissing the Elchoses’ counterclaim^ because they all lacked -factual support in the record. , The award of attorney’s fees was proper due to the Elchoses’ gross negligence, which was evidenced in the record. Therefore, the'judgment of the Hancock County Chancery Court is affirmed, with costs assessed -to the El-choses. ■
¶ 53. AFFIRMED.
LAMAR, CHANDLER AND PIERCE, JJ., CONCUR. KITCHENS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN Opinion joined by waller, c.j., ' AND KING, J. COLEMAN, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J.; LAMAR AND PIERCE, JJ., JOIN IN PART.. , ‘

. Kevin testified at trial that Stephan is a "distant cousin.”

. The blue lines drawn on exhibit six represent the property lines that the Elchoses claim are the actual boundaries of the property conveyed.

. By the Elchoses' motion, the chancellor granted a 180-day extension, upon ordering the Elchoses to post a “supersedeas bond’.’ in the amount of $50,000 to cover the $25,000 estimated cost to move the house, plus 125%, along with 125% of the attorney’s fees. While the bond was called a "supersedeas,” the parties treated it as, and affirmed at oral argument that they understood it to be, a performance bond. At oral argument, the Elchoses’ counsel first informed the Court that the Elchoses had moved the house, to place it upon the property described in the deed and survey. Yet, they continued to assert they were entitled to reformation of the deed, and in light of their moving the house, would seek damages in the amount of the cost to move the house, rather than actual reformation, should this Court1 reverse the chancellor’s decision.

. Originally, the case was submitted without oral argument. After due consideration, the Court, en banc, granted oral argument and sought supplemental briefing. The issues are those raised by the, Elchoses on appeal, supplemented by those .sought .by this Court for review.

. Brimm is inapplicable to our analysis because, as stated by Justice Kitchens's separate opinion, Brimm involved (1) an admitted mistake (2) "in conveyancing,” neither of which occurred in the case sub judice. (Kitchens Op. ¶ 57) (citing Brimm v. McGee, 119 Miss. 52, 57-58, 80 So. 379, 381 (1919)). Rather than a mistake "in conveyancing," this case involves a unilateral mistake post-conveyancing. Thus, Brimm is not authority for our resolution of this case.

. No evidence can be found in the record that the Hanses had knowledge, were passive, or were unconcerned until discord developed between the parties unrelated to the encroachment.

. The record reflects no claim of ownership when the lidiosos completed the house. The Haases first claimed ownership in late 2007, immediately upon being informed that the .Elchoses were encroaching ón Haas property.

.Cox had become embroiled with Department of Environmental Quality concerns reported by Pitts.