# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-CA-01213-SCT

*PERRY A. ELCHOS AND WIFE, LORI A. ELCHOS*

*v.*

*KEVIN J. HAAS AND WIFE, LISA T. HAAS*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/12/2013 |
| TRIAL JUDGE: | HON. CARTER O. BISE |
| TRIAL COURT ATTORNEYS: | VIRGIL G. GILLESPIE |
| | WILLIAM ALEX BRADY, II |
| COURT FROM WHICH APPEALED: | HANCOCK COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | WILLIAM ALEX BRADY, II |
| ATTORNEY FOR APPELLEES: | VIRGIL G. GILLESPIE |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | AFFIRMED - 10/08/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## EN BANC.

### RANDOLPH, PRESIDING JUSTICE, FOR THE COURT:

¶1. Perry and Lori Elchos (the Elchoses) purchased a 1.11 acre (more or less) parcel of a fifty-acre tract of largely undeveloped land located near and on the Jourdan River in Hancock County near Kiln, Mississippi, from Kevin and Lisa Haas (the Haases) in 2004. The Elchoses proceeded to construct a house partially on property the Haases did not sell or convey to the Elchoses. After an unsuccessful attempt to resolve the dispute, the Haases sued, claiming the Elchoses were trespassing and violating restrictive covenants to which they had agreed at the time of the sale and conveyance. The Elchoses answered and claimed, *inter*

*alia*, that the dispute resulted from a mutual mistake and that the Haases' claims were barred

by the doctrines of estoppel and laches. After receiving evidence and testimony at trial, the

chancellor found that the Elchoses, who had received a deed, complete with an attached

property description and survey, knew or should have known the boundaries of the property

they had purchased. The chancellor further found that the Haases were without knowledge

of the encroachment until December 2007. Thus, he decreed that the Elchoses should move

the structure off of the Haases' property and onto the property the Elchoses purchased.

Aggrieved, the Elchoses appealed the chancellor's judgment to this Court. We affirm.

**STANDARD OF REVIEW**

¶2.      "[A] chancellor's findings of fact are unassailable on appeal unless those findings are

manifestly wrong. *McCoy v. McCoy*, 611 So. 2d 957, 960 (Miss. 1992). In *David M. Cox,*

*Inc. v. Pitts*, the court held that:

> Where the Chancellor was the trier of facts, his findings of fact on conflicting
> evidence cannot be disturbed by this Court on appeal unless we can say with
> reasonable certainty that these findings were manifestly wrong and against the
> overwhelming weight of the evidence. Even if this Court disagreed with the
> lower court on the finding of fact and might have arrived at a different
> conclusion, we are still bound by the [C]hancellor's findings unless manifestly
> wrong. The Chancellor's role as fact finder parallels that of a juror . . . . [A]s
> [the] sole judge [ ] of the facts in this case, [he] determine[d] what weight and
> what credibility [would] be assigned the testimony and supporting evidence of
> each witness in this case. [He][was] required to use . . . good common sense
> and sound, honest judgment in considering and weighing the testimony of each
> witness. A Chancellor is afforded the favor of observing the demeanor of
> witnesses and he is called upon to exercise his discretion, as we similarly
> mandate jurors . . . . [T]his Court held, the credibility of the witnesses and the
> weight of their testimony, as well as the interpretation of evidence where it is
> capable of more than one reasonable interpretation, are primarily for the
> chancellor as the trier of facts. [It was] further stated that if the issue is one of
> fact, the Chancellor's decision will not be disturbed unless it is manifestly

2

wrong. As with any finder of fact, he is entitled to consider the interests witnesses may have in the outcome.

*David M. Cox, Inc. v. Pitts*, 29 So. 3d 795, 804-05 (Miss. Ct. App. 2009) (quoting *In re Extension and Enlarging of Boundaries of the City of Laurel, Miss.*, 922 So. 2d 791, 795 (Miss. 2006) (quoting *Richardson v. Riley*, 355 So. 2d 667, 668 (Miss.1978))) (internal citations omitted).

¶3.    Our appellate review is considered in the light most favorable to the party who found favor in the chancellor's ruling. *Bright v. Michel*, 242 Miss. 738, 743 (Miss. 1962). If conflicting testimony is presented, all testimony favoring the Haases must be accepted, along with all permissible inferences which the chancellor could draw from the proof and circumstances, becoming established facts. *Id*. All attempts to seek application of estoppel and laches require intense factual analysis, and each case must be judged separately. *Bright*, 242 Miss. at 749; *Pitts*, 29 So. 3d at 802.

¶4.    A fact-intensive analysis is inherent in examining the defenses of mutual mistake, estoppel, and laches. Given the legal standard of great deference afforded to a chancellor's findings, we examine the record to ensure sufficient evidence supports his findings. A chancellor's findings shall not be disturbed absent manifest error. *See Bright*, 242 Miss. at 749; *Pitts*, 29 So. 3d at 802.

## FACTS

### KEVIN HAAS

¶5.    Kevin Haas purchased fifty-plus acres, from which he sold a 1.1-acre parcel to the Elchoses. The parties entered into a sales contract on March 4, 2004, contingent upon Haas

providing Elchos a survey. Sidney Fournet conducted a survey on April 20, 2004. Haas provided Elchos with the survey by handing it to him in person prior to the May 2004 closing.

¶6.    Haas and Elchos viewed the property prior to consummation of the sale. Haas " . . . showed [Elchos] about where his lot would be." The property was "grown-up" and there were "stakes everywhere." He did not show Elchos any particular stakes because he did not know which stakes were for which parcels. Because of this uncertainty, it was agreed for a survey to be conducted prior to closing. The executed sales contract provided, "[s]ale is subject to purchaser's approval of survey results. Purchaser may rescind contract if survey is not acceptable to purchaser." On cross-examination, Haas testified he went to the property with the Elchoses and with a real estate agent, Stephan Haas,[1] who contacted him on their behalf. The visit to the property was before the March 12, 2004, contract was signed. Haas reiterated that he did not know the exact boundaries of the parcels, so he showed the Elchoses "where [their] lot was about located." Haas further stated that he still did not know exactly where the lot was located, and he did not know the exact boundaries of the lot until it was discovered that the Elchoses' structure had been built on the wrong lot, which was ultimately confirmed by a 2008 survey.

¶7.    Haas explained how the larger tract was divided, using exhibits admitted at trial. Haas's sister, Gina Larsen, owned the easternmost parcel of the fifty-plus-acre property, a campsite on the Jourdan River. Another campsite, adjoined immediately west, was owned

---

[1]Kevin testified at trial that Stephan is a "distant cousin."

by his brother, Stephen Haas. The Haases later sold the parcel immediately west of Stephen's property to the Sheffields. The undeveloped Sheffield parcel was labeled as Kevin Haas's parcel on the exhibits and lies between Stephen's parcel (on the east) and Kevin and Lisa Haas's .97-acre parcel (on the west). Testimony was undisputed that the .97-acre parcel was being held for Haas's cousin, Cletus. Haas sold the "waterfront property" to the Sheffields for $250,000. Haas explained that their .97-acre parcel is a 100-foot-wide parcel, immediately west of the Sheffields' parcel. The Elchoses' property is also a 100-foot-wide parcel, and it lies immediately west of the Haases' .97-acre parcel.

¶8.     Haas's activity on the fifty-plus acres of undeveloped property was minimal during the time in which the Elchos structure was being built. He acknowledged that he did pass on a gravel road leading by the Elchos property to get to his own property. Exhibits reveal the gravel road was situated on a fifty-foot-wide ingress/egress perpetual easement. The gravel road runs west to east, north of the contested properties. The Elchoses' driveway enters the gravel road at the northwestern edge of the property they purchased, totally within the property they purchased. Another exhibit reveals that the northernmost corner of the structure was 156.6 feet south of the southernmost boundary of the gravel road.

¶9.     Haas acknowledged that a trucking company he owned delivered three or four loads of fill dirt to the Elchoses. A company employee, not Haas, made the deliveries. He also testified that the Elchoses' roof blew off during Hurricane Katrina and Haas pushed the roof up to the road for FEMA pick-up. Also, at Elchos's request, Haas had used a piece of his heavy equipment to straighten the structure "wracked" during Katrina. Haas testified that he

5

was totally unaware that the structure was built on the wrong property until years later. Haas stated that he never saw Elchos placing t-posts on the property, nor did he ever see string connecting t-posts when he was on the property following Katrina. The t-posts were not present when he was clearing the aftermath of Hurricane Katrina. Haas testified that he saw the foundation from a distance when it was being formed but did not know the foundation was partially on his property.

¶10.    Haas first became aware of the encroachment when Elchos called Haas to inform him that the lots were "messed up." Haas responded that the lots could not be "messed up" because they were certified by two different companies. Fournet, a surveyor, was present with Elchos and got on the phone. Fournet told Haas that "the lots are not messed up. Mr. Elchos built three-quarters of his house on your property." Thereafter, the April 2008 survey was performed and confirmed the encroachment.

¶11.    The Elchoses' structure is angled to provide a view of the Jourdan River, but the rectangular plot abuts a pond, once used to hold logs. Haas testified that Elchos said that he turned the structure to face the river. Haas explained that's how he "messed up" and "got cross ways on the line." Haas explained that the Sheffield property, Stephen's property, and Gina's property are all on the river, but the properties west of the Sheffield property are all on and face the log pond.

SIDNEY FOURNET, SURVEYOR

¶12.    Sidney Fournet affirmed that, when he referenced the survey of April 2004, he divided the lots west of the present Sheffield (then Kevin and Lisa Haas) property. He also prepared

the 2008 survey, which exhibits the Elchoses' driveway beginning at the easement road on the correct lot, but that the Elchoses had built across the lot lines. He further affirmed that the property description in the deed to the Elchoses' property matches the survey. Before the 2004 survey, the only permanent markers were those that outlined the entire fifty-plus-acre property. At the time he performed the 2004 survey, he marked the lots using eighteen-inch, half-inch rebar. He stated that he first saw t-posts in 2008 when he resurveyed the property. Fournet testified that "it looks like the wrong pins [were] used to stake the house." He explained that, in his opinion, the Elchoses used the wrong front pins, using the (southern) front pins 100 feet to the east of the front pins marking their lot. The front pins were identified as the pins near the log pond. Fournet provided that no competent, knowledgeable surveyor would lay out the Elchos lot as shown by the blue lines on exhibit six, which the Elchoses claim is their lot.[2]

## KELLY KING

¶13.    Kelly King, who laid the foundation for the Elchos structure, testified that Elchos showed him four steel pipes (pins) and instructed him that those pipes outlined his property. King testified that he did not recall seeing any t-posts or string marking the property lines. King further testified that he, not Elchos, pulled string to connect the four pipes Elchos showed him. King testified that Elchos did not provide him with a survey. He testified that Elchos wanted his property as close to the water as possible. He also stated that Haas showed him where an elevation point was, but he did so on other Haas-owned property, and that he

_____

[2]The blue lines drawn on exhibit six represent the property lines that the Elchoses claim are the actual boundaries of the property conveyed.

7

had never seen Haas on the Elchoses' property when he laid out and constructed the Elchos foundation.

## STEPHAN HAAS, REAL ESTATE AGENT

¶14. Stephan Haas was a real estate agent for the Elchoses. He set up a meeting with Elchos, Kevin Haas, and himself. Stephan provided that there were no markers or property lines indicating where the lots were located at the time of the first meeting. Stephan stated that Kevin Haas had explained how the easternmost parcel was his sister's; then moving immediately west, was his brother's parcel; then Kevin and Lisa Haas's own parcel (now the Sheffields'). All were located on the Jourdan River. Stephan testified that they were looking at property on the log-pond area and did not walk over to the river-front property. Stephan explained that Elchos had stated that he wanted the easternmost lot on the log pond, but that Kevin Haas told him that lot, " the first lot," was being held for his cousin, Cletus. Kevin Haas told Elchos he could purchase the lot immediately west of the lot he was holding for his cousin. Stephan said they also looked at additional westward lots on the log pond, but returned to "the second lot," which was located immediately west of the first lot. Stephan stated that Elchos wanted to purchase the first lot because "you get a better view," since there is a bend in the river.

¶15. Stephan reiterated there was no doubt in his mind that Kevin Haas had explained to Elchos that he would be purchasing the second lot on the log pond, because the first lot was being reserved for Cletus and was not for sale at any price. His testimony also provided that a survey would have to be finished before he could sell the property. He went on to explain

8

that the lack of a survey is why the sales contract stated that Elchos would be purchasing the lot 100 feet west of Kevin Haas's property. Stephan also provided it was clear that the lot the Elchoses were purchasing was the second lot on the log pond. He further stated that Kevin Haas had explicitly said the lots would run straight up and down.

PERRY ELCHOS

¶16.    Perry Elchos testified that he and Stephan Haas met Kevin Haas at the southeast corner of the first lot on the log pond and that they proceeded to walk west on the water's edge. Elchos stated that there were a few physical markers, but that "they were scattered . . . [and] you couldn't really tell what was what." He also stated that most of the visible markers were on the northern edge of the property because the water's edge was overgrown and not visible. He provided that there were no flags, fence posts, etc., marking any corners of the property.

¶17.    Elchos went on to testify that "they were selling us lot 2, a hundred feet west of Kevin's[.]" He further provided that he was not shown any markers on the day that he signed the sales contract, nor did he walk the entire property. He stated that he wanted the provision in the sales contract which required a survey because he knew that there were other lots close by, one of which was being saved for Haas's cousin, and that he did not know where lot 2 was in relation to anything. He reiterated that he would not close on the property until the survey was completed.

¶18.    Elchos said he met Kevin Haas at the property a second time. He stated that they began by finding the northeastern-most pin and began walking westward until they reached

9

an artesian well (marked on an exhibit by Elchos). Elchos stated that Haas had told him that the well was Haas's and that Elchos could not have that first lot. They continued walking west to the next lot, which was for sale. Elchos said he wanted to purchase that lot. Elchos then said they "walked straight down from the middle of the lot" to the pin at the southernmost edge of the property. He testified that he went back to the property later (after closing), and marked what he believed to be his property using t-posts and pulled-string, without reference to or reliance on the survey.

¶19.    Elchos's testimony regarding Haas's knowledge was equivocal. He said he did not believe that Haas knew where the lots were. He later said that "[Haas] knew where my lot was." Of particular significance, he testified that Haas did not know that Elchos was building on the wrong lot.

### LORI ELCHOS

¶20.    Lori Elchos testified she was present when Haas showed them the lot. They "stood in the area of the lot" close to the water's edge by the log pond. She did not recall any markings on the property at that time.

### TRIAL COURT'S FINDINGS AND FURTHER PROCEEDINGS

¶21.    The chancellor found: (1) that the Elchoses received a survey prior to the sale, as was stipulated in the sales contract; (2) that "said survey was attached to the Deed . . ."; (3) that in March 2005, the Elchoses began construction partially on their property and partially on the Haas property; (4) that the Haases did not discover the encroachment until December 2007; (5) that the Elchoses knew, or should have known, that they were building partially on

10

their property and partially on the Haases' property; (6) that the Haases had met their burden of proof; and (7) " . . . that the evidence sustains a finding of gross negligence, thereby justifying an assessment of attorney fees[.]"

¶22.   The chancellor ordered the Elchoses to move the house off of the Haases' property within 120 days and to abide by and obey the covenants contained in their deed.[3] The chancellor awarded the Haases one dollar in damages for the Elchoses' trespass and ordered the Elchoses to pay $15,928.75 to cover the costs of the Haases' attorney's fees. All of the Elchoses' counterclaims were dismissed with prejudice. The Elchoses appealed.[4]

## ANALYSIS

    1.    **Whether the chancery court erred by failing to reform the Elchoses' deed because both the Elchoses and the Haases were mutually mistaken with regard to the property conveyed.**

¶23.   It is outside the purview of this Court's authority to reweigh evidence. *Pitts*, 29 So. 3d at 804-05. We are to accept the chancellor's findings of facts and ensure that those

---

[3] By the Elchoses' motion, the chancellor granted a 180-day extension, upon ordering the Elchoses to post a "supersedeas bond" in the amount of $50,000 to cover the $25,000 estimated cost to move the house, plus 125%, along with 125% of the attorney's fees. While the bond was called a "supersedeas," the parties treated it as, and affirmed at oral argument that they understood it to be, a performance bond. At oral argument, the Elchoses' counsel first informed the Court that the Elchoses had moved the house, to place it upon the property described in the deed and survey. Yet, they continued to assert they were entitled to reformation of the deed, and in light of their moving the house, would seek damages in the amount of the cost to move the house, rather than actual reformation, should this Court reverse the chancellor's decision.

[4] Originally, the case was submitted without oral argument. After due consideration, the Court, *en banc*, granted oral argument and sought supplemental briefing. The issues are those raised by the Elchoses on appeal, supplemented by those sought by this Court for review.

11

findings are supported by the evidence that was before him. *Id*. In today's case, the chancellor's findings are supported by the record before us.

¶24. "The right of persons to contract is fundamental to our jurisprudence and absent mutual mistake, fraud and/or illegality, the courts do not have the authority to modify, add to, or subtract from the terms of a contract validly executed between two parties." ***Wallace v. United Miss. Bank***, 726 So. 2d 578, 584 (Miss. 1998) (quoting ***First Nat'l Bank of Vicksburg v. Caruthers***, 443 So. 2d 861, 864 (Miss. 1983)). Deed disputes are examined under principles analogous to contracts. *See* ***Peoples Bank & Trust Co. v. Nettleton Fox Hunting & Fishing Ass'n***, 672 So. 2d 1235 (Miss. 1996). "[A] person is under an obligation to read a contract before signing it, and will not as a general rule be heard to complain of an oral misrepresentation the error of which would have been disclosed by reading the contract." ***Godfrey, Bassett & Kuykendall Architects, Ltd. v. Huntington Lumber & Supply Co., Inc.***, 584 So. 2d 1254, 1257 (Miss.1991).

¶25. "In an action to reform a deed based on a mistake theory, the petitioner must demonstrate a mutual mistake among the parties or a unilateral mistake in combination with fraud or inequitable conduct on the part of the benefitting party." ***McCoy***, 611 So. 2d at 961. The burden rests with the petitioner to "prove the mutual mistake occurred between the parties *beyond a reasonable doubt*." ***Id.*** (emphasis added). A mutual mistake is defined as "[a] mistake that is shared and relied on *by both parties* to a contract." *Mutual mistake*, Black's Law Dictionary (10th ed. 2014) (emphasis added).

12

¶26. The chancellor was presented with testimony over three days. The sales contract stated, "owner is purchasing lot 2, which is 100 feet west of Kevin and Lisa Haas's riverfront lot." The surveys and testimony presented at trial reveal that the Elchoses' structure encroaches upon lot 1 (property that he wanted to buy but was refused), and lot 2 (the property he contracted to purchase and for which he received a deed and survey, properly described). Not a single exhibit or witness's testimony undermines the fact that lot 2 began 100 feet west of Kevin Haas's property (currently the Sheffields'). Elchos conceded that the property with the artesian well (lot 1) was not for sale. Elchos ensured that the sale was contingent upon receipt of a survey so that he could be certain where lot 2 was located, before closing. A survey was provided to Elchos and revealed that lot 2 begins 100 feet west of Kevin Haas's property. It is undisputed that the deed matches the survey Elchos was given. Elchos agreed to the sales contract, contingent upon receipt of the survey. Elchos then closed on the property upon presentation of the survey and deed. All three documents describe the same parcel.

¶27. Evidence in the record dispels mutual mistake, as found by the chancellor. The Elchoses failed to carry their burden of establishing beyond a reasonable doubt that a mutual mistake occurred. The chancellor determined that the mistake was made by the Elchoses (unilaterally). The record reveals no proof of fraud or inequitable conduct by the Haases. Facts to support the chancellor's rejection of the claim of mutual mistake are clearly in the record before us. After hearing testimony from the parties and from disinterested witnesses, the chancellor rejected any notion that a mistake was shared by both parties, but found rather

13

that the Elchoses' negligence caused the dilemma.[5] The chancellor found that the Elchoses were bound to the property description contained in the warranty deed and survey. He found that the parties were bound by the terms of their contract. The chancellor cited **Turner v. Morris**, 196 Miss. 297, 17 So. 2d 205, 207 (Miss. 1944) (" . . . the appellees must be charged with knowing that their deed gave them no right to encroach on the appellant's land[.]"), and that, by examining the deed, the Elchoses would have known which property to build on and that they were building on the wrong property.

¶28.     The final judgment reads, "Mr. and Mrs. Haas have fully met their burden of proof and their Complaint for Mandatory Injunction should be fully sustained[.]" In cases such as this, the general rule of law is well-established:

> The general rule is that a landowner is entitled to an injunction directing the removal of a trespassing structure on his land erected thereon by the owner of adjoining land. The facts that the aggrieved owner suffers little or no damage from the trespass, that the wrongdoer acted in good faith and would be put to disproportionate expense by removal of the trespassing structures, and that neighborly conduct as well as business judgment would require acceptance of compensation in money for the land appropriated, are ordinarily no reasons for denying an injunction. Rights in real property cannot ordinarily be taken from the owner at a valuation, except under the power of eminent domain. Only when there is some estoppel or laches on the part of the plaintiff, or a refusal on his part to consent to acts necessary to the removal or abatement which he demands, will an injunction ordinarily be refused.

---

[5]**Brimm** is inapplicable to our analysis because, as stated by Justice Kitchens's separate opinion, **Brimm** involved (1) an admitted mistake (2) "in conveyancing," neither of which occurred in the case *sub judice*. (Kitchens Op. ¶ 57) (citing **Brimm v. McGee**, 119 Miss. 52, 57-58, 80 So. 379, 381 (1919)). Rather than a mistake "in conveyancing," this case involves a unilateral mistake post-conveyancing. Thus, **Brimm** is not authority for our resolution of this case.

14

*Shattles v. Field, Brackett & Pitts, Inc.*, 261 So. 2d 795, 797-98 (Miss. 1972). *See also*

*Residential Advantage Dev., LLC v. Executor, Adm'rs, Devisees, Beneficiaries, & Assigns*

*of Heirs-at-law of Dwight Tyrone Ross*, 136 So. 3d 476, 480 (Miss. Ct. App. 2014). The

evidence supports the decision of the chancellor not to reform the deed.

> **2. Whether the Haases' claim of title is barred by estoppel and/or laches.**

¶29. The record lacks evidentiary support for the application of estoppel or laches,

affirmative *defenses* to the Haases' claim of trespass. The Elchoses failed to meet their

burden to support these defenses. *See **Christian Methodist Episcopal Church v. S&S***

***Constr. Co.,*** 615 So. 2d 568, 571 (Miss. 1993). The Elchoses not only failed to sustain their

mutual-mistake claim, but they further failed to offer sufficient evidence to support the

defense of estoppel and/or laches.

¶30. "The defense of laches applies when one party neglects to assert a right or claim, and

such neglect, when taken together with any lapses of time and other circumstances causing

prejudice to the adverse party, operates as a bar in a court of equity." ***Bailey v. Estate of***

***Kemp***, 955 So. 2d 777, 784 (Miss. 2007).

> The general rule is that a landowner is entitled to an injunction directing the removal of a trespassing structure on his land erected thereon by the owner of adjoining land. . . . "'Only when there is some estoppel or laches on the part of the plaintiff, or a refusal on his part to consent to acts necessary to the removal or abatement which he demands will an injunction ordinarily be refused.'"

*Turner*, 17 So. 2d at 207 (citations omitted). "The party seeking to invoke the doctrine of

laches must show: (1) [the existence of a] delay in asserting a right or claim, (2) [that] the

15

delay was not excusable, and (3) [that] there was undue prejudice to the party against whom the claim [was] asserted." ***Miss. Dep't of Human Servs. v. Molden***, 644 So. 2d 1230, 1233 (Miss. 1994). Stated another way, the test is whether a party "induce[d] another to act to his prejudice." ***Perrien v. Mapp***, 374 So. 2d 794, 797 (Miss. 1979). No evidence was presented that Haas induced Elchos to act to his prejudice. The issue of laches is left to the sound discretion of the chancellor, "and his decision will not be overturned on appeal except where there is an abuse of discretion." ***Id.***

¶31.    As to estoppel,

> The rule of equity is, that if one man knowingly, though he does it passively by looking on, suffers another to purchase, and expend his money on land, under an erroneous opinion of title, without making known his claim, he should not afterwards be permitted to exercise his legal right against such person. It would be an act of fraud and injustice, and his conscience is bound by an equitable estoppel.

***Bright***, 137 So. 2d at 159. The factors that must be proven are *knowledge* and *passivity* that another is expending money on the land under an "erroneous opinion of title." ***Id.***; ***Nixon's Heirs v. Carco's Heirs***, 28 Miss. 414 (Miss. Err. & App. 1854). The record reflects the Elchoses established neither in their case at trial. Perry Elchos's own testimony defeats the defense. (*See supra* ¶19). The chancellor cited only ***Turner***, which we will address along with ***Bright*** and ***Pitts***, where equitable estoppel was applied.

¶32.    ***Turner*** concerned a two-foot strip of commercial/residential property in downtown Hattiesburg. The buyer had a perpetual easement to build a stairway on the strip leading down to the basement of his building. ***Turner***, 17 So. 2d at 206. Buyer built a stairwell, with a sustaining wall, running the entire height of his three-story building. ***Id.*** The court held,

16

regardless of whether a sustaining wall was allowed to accompany any stairway into the basement, the deed "clearly does not confer on them the right to construct a stairway on this strip of land leading from its surface to the upper floors of [Buyer's] building." *Id.*

¶33.    Buyer claimed Seller was estopped from objecting to the encroachment because Seller knew of the encroachment when the building was being erected and made no objection. *Id.* at 207. Some evidence showed Buyer frequently passed by the building, yet the court found that even if true, "it falls short of proof that the [Buyer] *realized* from what he saw when he was at or passing this building that it was being constructed so as to encroach on his land." *Id.* (emphasis added). The court held this lack of realization (lack of knowledge) alone was enough to prevent the application of estoppel, and then went on to say that it need not express an opinion whether the Buyer's knowledge of the deed alone would prevent the application of estoppel in the event Seller knew of the encroachment without objecting. *Id.*

¶34.    *Bright* provides an excellent example of when to apply the affirmative defense of estoppel/laches. *Bright* concerned a five-foot strip of land in the town of Hickory Flat. Bright owned land north of an unnamed road and a five-foot strip west of that road. *Bright*, 137 So. 2d at 156-57. Years later, the same person who sold the land to the Brights also sold land to the Michels, immediately west of the land sold to the Brights. *Id.* at 157. Bright was present at the sale and encouraged the transaction—he even assisted in measuring the tract and referred to the lot the Michels were purchasing as a "corner lot." *Id.* The Michels constructed a concrete gutter encroaching on the five-foot strip; Bright personally sold to the Michels the materials to build the gutter. *Id.* The Michels built a café and motel, also encroaching on the

17

strip of property, and they bought all the materials from the Brights; the Brights even loaned the Michels money for the projects. *Id.* Most importantly, Bright stated it looked like to him that Michels was "getting over the line." *Id.* The Brights "constantly used the driveway" constructed on the unnamed street and running adjacent to the five-foot strip while the Michels were building on the five-foot strip, but nothing further was said about any encroachment until the Brights and the Michels had a falling out. *Id.* at 157-58.

¶35. When the Brights later sued the Michels seeking an injunction for the removal of the offending structures, the judge denied them relief under the doctrine of estoppel. *Id.* at 158. The Brights "were unconcerned whether the Michels were encroaching on the Bright property[,]" they "sold all the materials for the construction which encroached," and the Brights "observed the encroachments being built."[6] *Id.* at 159. The Brights knew the Michels were building on their property and watched as they continued to expend money in improvements; the Brights even encouraged the improvements by selling the materials and loaning money. Because the requisite elements of knowledge and passivity were met, the Brights were estopped from asserting their right to an injunction. *See also Martin v. Franklin*, 245 So. 2d 602 (Miss. 1971) (finding a landowner who lived across the street from site where another party was building a home on the landowner's property in full view of the landowner estopped from asserting his right to an injunction). In *Martin*, "the chancellor found that Martin simply waited until the house was finished before he made his claim of

---

[6]No evidence can be found in the record that the Haases had knowledge, were passive, or were unconcerned until discord developed between the parties unrelated to the encroachment.

18

ownership."[7] *Id.* at 604. Without any aid of additional survey or research, on the day the contractor completed building the house, as he "was putting the lock on the front door," Martin went up to the contractor and asked, "Do you know you are building a house on my land?" *Id.*

¶36.    More recently, the Court of Appeals held that equity required the sale of disputed land where the Pittses built a garage on property owned by David M. Cox, Inc., rather than granting Cox's requested injunction. *Pitts*, 29 So. 3d at 804. Cox owned a subdivision, in which it had sold a lot to Hendry, who built a house and driveway on the property. *Id.* at 797. Hendry built the driveway partially on an adjacent lot owned by Cox. *Id.* Hendry sold his lot to the Pittses, who later built a detached garage at the end of the driveway; as such, the garage also encroached on Cox's lot. *Id.* Cox's daughter (the vice-president of David M. Cox, Inc.) acted as the dual agent for both Hendry and the Pittses. *Id.* at 798. Cox's daughter informed the Pittses there was no need for a survey and that their property extended about fifteen feet beyond the driveway. *Id.* at 798-99. The Pittses built their garage at the end of the driveway, within where they were told their property lay. *Id.* Cox himself told the Pittses it was okay for them to pour their foundation in the location they staked-out and passed right by the construction site in the subdivision "every day." *Id.* at 800. When the encroachment was discovered, Hendry attempted to buy the adjoining lot from Cox for the price Cox

---

[7]The record reflects no claim of ownership when the Elchoses completed the house. The Haases first claimed ownership in late 2007, immediately upon being informed that the Elchoses were encroaching on Haas property.

quoted: $30,000. *Id.* When Hendry informed Cox he intended to sell the Pittses the portion on which their garage was sitting, Cox refused to sell.[8] *Id.*

¶37.    Finding no party without fault, but that the Pittses were the only non-experienced party (Cox being a real-estate developer, his daughter a real-estate agent, and Hendry an experienced builder), the chancellor determined equity required Cox to sell the portion of the adjoining lot on which the Pittses' garage encroached and for the Pittses to pay the highest market value available for the property. *Id.* at 801-80. The Court of Appeals affirmed due to Cox's knowledge that the structure was being built on his property (he and his daughter passed by and saw it every day) and passivity in failing to assert his right (Cox and his agent-daughter even aided in the construction by informing the Pittses that their land extended beyond the driveway and that the foundation was in a proper location). *Id.* at 803-06.

¶38.    A review of our caselaw and a review of the evidence offered at trial fails to support application of the defenses of estoppel and/or laches. In his judgment, the chancellor found a critical fact which defeats the affirmative defense of estoppel and laches: the Haases did not learn of the encroachment until December 2007 and complained immediately. We have held that "every case of equitable estoppel must rest on the particular facts involved." *Bright*, 137 So. 2d at 159. Here, Elchos testified that Haas did not know that Elchos was building on the wrong lot. Here, the chancellor rejected the Elchoses' claims that Haas passively sat by with knowledge that Elchos was building a structure on his lot. The chancellor was presented with substantial evidence of the very opposite, a good portion

_____

[8]Cox had become embroiled with Department of Environmental Quality concerns reported by Pitts.

coming from disinterested witnesses. Throughout his testimony, Elchos stated that Haas did not know where the lot was. All testimony supported that Haas was surprised when he learned that the Elchoses' structure was on his lot. Knowledge aside (constructive or otherwise), the evidence provides no support that Haas passively looked on, suffering the Elchoses to expend money on land owned by Haas. Estoppel requires proof of *both* knowledge *and* passivity—essential elements which the Elchoses failed to establish.

¶39. Although a ***Bright***/***Pitts*** analysis by the chancellor would have been beneficial, his failure to cite those cases does not prevent our resolution of this case. The facts of those cases are readily distinguishable from the record in this case, and the proof offered for the existence of either estoppel or laches is nonexistent.

¶40. This case involves a small parcel of land out of a fifty-plus acre tract of relatively undeveloped land. ***Bright*** and ***Pitts*** concerned narrow strips of land in developed areas—a dedicated street intersecting U.S. Highway 78 in the Town of Hickory Flat and a 200-lot platted subdivision, The Trace in Lamar County, respectively. In ***Bright*** and ***Pitts***, the parties seeking injunctions knew exactly where the construction was taking place and actively participated in and encouraged the building of the encroaching structure. Haas did not know the Elchoses were building on Haas's property because of overgrowth and the distance from the gravel road to the site. The only component in close proximity to the road was the entrance to the Elchoses' driveway, which was on the northeastern corner of the lot they purchased. Haas never told Elchos the foundation or structure was properly located. Haas did not live next door or across the street, he did not pass by or see the construction every day,

and he did not announce his claim to the property as soon as construction was completed. Nor did Haas espouse any belief that the Elchoses were encroaching on his land while simultaneously acquiescing to any encroachment. He asserted his right as soon as he was informed the Elchoses had built on his property and sought appropriate relief.

¶41. Haas unequivocally stated that he had no knowledge that the Elchoses were on his property. Elchos agreed. Accordingly, the record supports the chancellor's finding that the Haases' claims were not barred. "[T]he doctrine [of equitable estoppel] should be applied cautiously and only when equity clearly requires it be done." **Bright**, 137 So. 2d at 159. Here, the doctrine does not apply.

### 3. Whether the chancery court erred in dismissing the Elchoses' counterclaims of negligent misrepresentation, breach of contract, and intentional misrepresentation.

¶42. The chancery court dismissed the Elchoses' counterclaims with prejudice. On appeal, the Elchoses seek reversal of the chancellor's judgment, arguing that Haas negligently misrepresented the location of the Elchoses' lot, that Haas breached a purported contract with the Elchoses to provide amenities (water, sewer, and power) and to pave an entrance road to the property, and that Haas intentionally misrepresented to the Elchoses that they were purchasing a lot in a subdivision and those amenities (water, sewer, and power) would be provided.

¶43. To establish a claim of negligent misrepresentation, the party asserting the claim must prove, by a preponderance of the evidence, the following elements;

> (1) a misrepresentation or omission of a fact; (2) that the representation or omission is material or significant; (3) that the person/entity charged with the

negligence failed to exercise that degree of diligence and expertise the public is entitled to expect of such persons/entities; (4) that the plaintiff reasonably relied upon the misrepresentation or omission; and (5) that the plaintiff suffered damages as a direct or proximate result of such reasonable reliance.

*Holland v. Peoples Bank and Trust*, 3 So. 3d 94, 101 (Miss. 2008). We cannot say based on a review of the record that Haas was negligent to the extent that he "failed to exercise that degree of diligence and expertise the public is entitled to expect" of persons conveying property. *See id.* A survey of the land conveyed was, in fact, provided. The Elchoses never established reasonable reliance on Haas's purported misrepresentation regarding the location of their lot. In their counterclaim, the Elchoses asserted that they "suffered damages as a direct and proximate result of such reasonable reliance" and that they thereby "are entitled to recover all damages resulting from the negligent misrepresentation," but no evidence of reasonable reliance and/or damages was forthcoming. We hold that the chancellor did not err as a matter of law by dismissing the Elchoses' negligent-misrepresentation claim.

¶44. The Elchoses also claim that Haas breached the sales contract by failing to provide water, sewer, and power, though those amenities were to be expected in a subdivision. Also, the Elchoses claim that Haas breached the contract by failing to pave an entrance road on the property. Mississippi Code Section 15-3-1(c) (Rev. 2012) bars any action concerning contracts for the sale of land "unless . . . the promise or agreement upon which such action may be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith . . . ." This Court has held that "[t]he principal purpose of the Statute of Frauds . . . is to require the contracting parties to reduce to writing the specific terms of their contract, especially an agreement affecting lands for more than one year, and

23

thus to avoid dependence on the imperfect memory of the contracting parties, after the passage of time, as to what they actually agreed to some time in the past." ***Sharpsburg Farms, Inc. v. Williams***, 363 So. 2d 1350, 1354 (Miss. 1978). No writing memorialized the purported contract alleged by the Elchoses to have been breached. The contract of sale was silent regarding the provision of water, sewer, and power to the Elchoses' lot.

¶45.    Stephan Haas testified that, while no representations were made with regard to power, as to "sewer and water, there were representations made." Those representations were initially memorialized in the sales contract, but roughly four days prior to closing, the Elchoses "called [Stephan] up and said they wanted those taken out." Apparently, "Mr. Elchos said he didn't care about the water and sewage because he was going to run a sewage that sprinkled on the property . . . ." The Elchoses cannot complain now about something they asked to be removed from the contract.

¶46.    While Elchos did not "care about the water and sewage," according to Stephan, "he did care about paving," which was stated in the final writing as follows: "[c]losing attorney shall hold $25,000 in escrow after closing to be dispersed to owner at the time of completion of paving unnamed entrance road to property." While Elchos claimed not to know that the $25,000 was being released to Haas at closing, the Settlement Statement was signed by both Perry and Lori Elchos and belies their claim. The Settlement Statement reflected that the $25,000, characterized as "Deposit or earnest money," was to be released to the seller. Because their contentions are without merit, we affirm the chancellor's dismissal of the Elchoses' breach-of-contract claim.

24

¶47. Lastly, the Elchoses counterclaimed that Haas's purported statements regarding provision of water, sewer, and power amounted to an intentional or fraudulent misrepresentation. According to this Court, a plaintiff asserting fraudulent misrepresentation must prove the following elements, by clear and convincing evidence:

> (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of the truth; (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury.

*Holland*, 3 So. 3d at 100. But the facts presented at trial simply do not rise to the required level of culpability on the Haases' part to support the Elchoses' claim of intentional or fraudulent misrepresentation. No evidence in the record supports the claim that Haas intentionally made statements to the Elchoses in order to induce them to purchase the property. Additionally, as with their claim of negligent misrepresentation, the Elchoses failed to present evidence regarding precisely how they were injured, consequently or proximately, by Haas's purported misrepresentations.

¶48. The chancellor did not err as a matter of law by dismissing the Elchoses' counterclaims with prejudice, since their counterclaims are without factual support in the record. Consequently, we affirm the dismissal of all of the Elchoses' counterclaims.

### 4. Whether the chancery court erred in awarding attorney's fees to the Haases.

49. Both parties requested attorney's fees at trial. The chancellor entered judgment in favor of the Haases for attorney's fees, amounting to $15,928.75. The Elchoses assert on appeal that "Haas was awarded attorney's fees and costs as a result of the very Covenants he

25

provided to the Elchoses" and that the chancellor erred as a matter of law in granting the award. The Haases claim the award was warranted, since the Elchoses were guilty of "gross negligence" and violated the protective covenants in the deed.

¶50. "[T]he matter of determining attorney's fees . . . is largely entrusted to the discretion of the chancellor." *A.M.L. v. J.W.L.*, 98 So. 3d 1001, 1022 (Miss. 2012). "The standard of review regarding attorneys' fees is the abuse of discretion standard, and such awards must be supported by credible evidence." *Bailey v. Estate of Kemp*, 955 So. 2d 777, 787 (Miss. 2007).

¶51. In awarding attorney's fees to the Haases, the chancellor found that the evidence supported a finding of gross negligence on the part of the Elchoses in building their home partially on the Haases' property even though they were provided with a proper survey and deed fully describing the property they in fact bought and that was intended to be conveyed. Evidence in the record supports this award and we cannot say the chancellor abused his discretion in so awarding.

**CONCLUSION**

¶52. The Elchoses knowingly bought lot 2. The Haases knowingly sold lot 2. When the Elchoses built their home partially on lot 1 and partially on lot 2—in contravention of the deed description and survey—there was no mutual mistake as to where the property line was or what property was sold, so the chancellor properly refused to reform the deed. The Haases did not know the Elchoses had built on their property until 2007, so neither estoppel nor laches acted to bar them from asserting their claims. The chancellor did not err in dismissing

26

the Elchoses' counterclaims because they all lacked factual support in the record. The award of attorney's fees was proper due to the Elchoses' gross negligence, which was evidenced in the record. Therefore, the judgment of the Hancock County Chancery Court is affirmed, with costs assessed to the Elchoses.

¶53.  **AFFIRMED.**

**LAMAR, CHANDLER AND PIERCE, JJ., CONCUR. KITCHENS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J., AND KING, J. COLEMAN, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J.; LAMAR AND PIERCE, JJ., JOIN IN PART.**

**KITCHENS, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶54.  I concur with the plurality that the chancellor did not err in dismissing the Elchoses' counterclaims, because I agree that the counterclaims are unsupported by the record. But I do not agree with the plurality that the chancellor applied the correct legal standard to his consideration of the Elchoses' claim of mutual mistake, and I do not agree that the Elchoses' affirmative defenses of estoppel and laches lacked evidentiary support. I therefore respectfully concur in part and dissent in part.

    **1.**    **The chancery court applied an incorrect legal standard in its consideration of the Elchoses' claim of mutual mistake.**

¶55.  The Elchoses claim on appeal that equity favors reformation of the deed, since they and Kevin Haas were mutually mistaken with regard to the boundaries of the property to be conveyed. The Haases urge that the Elchoses are bound to the property description in the contract of sale, in the survey, and in the deed, the position the plurality adopts.

27

¶56.     This Court has held that, "[i]n an action to reform a deed based on a mistake theory, the petitioner must demonstrate a mutual mistake among the parties or a unilateral mistake in combination with fraud or inequitable conduct on the part of the benefitting party." *McCoy v. McCoy*, 611 So. 2d 957, 961 (Miss. 1992) (citing *Perrien v. Mapp*, 374 So. 2d 794, 796 (Miss. 1979)). The burden rests with the petitioner to "prove the mutual mistake occurred between the parties beyond a reasonable doubt." *Id.* (citing *Webb v. Brown*, 404 So. 2d 1029, 1032 (Miss. 1981)). But this Court further has held in similar cases that "it is not the description [the parties] intended to write which controls, but the property the parties intended to include in the description used." *Webb*, 404 So. 2d at 1031-32 (citing *Brimm v. McGee*, 119 Miss. 52, 57, 80 So. 379, 381 (1919) ("[i]t is not what description the parties *intended* to write but what property the parties intended to have embraced in the description they used.") (emphasis added)).

¶57.     The *Brimm* Court continued:

> To hold that a court of equity could not . . . correct mistakes for the reason alone that the parties used the terms they actually intended to use would be to curtail its powers to a hitherto unheard extent. Most mistakes of fact in conveyancing, except those caused by clerical misprision, arise in cases when descriptive terms are intentionally employed under the mistaken impression that they apply to the property sought to be conveyed.

*Brimm*, 80 So. at 381 (quoting *Miles v. Miles*, 84 Miss. 624, 37 So. 112 (1904)). The Court further held that, "[w]hen the mistake is admitted, then it is said there is no difficulty; then there is an equity dehors the deed or instrument, and the power to relieve is said to be quite as clear when the mistake is shown by proof either written or parol." *Brimm*, 80 So. at 381

28

(quoting *Simmons et al. v. North et al.*, 11 Miss. 67, 71 (1844)). In *Smalley v. Rogers*, this Court stated:

> Of course, equity will not make contracts for parties. "If an agreement is just what the parties intended it should be, no matter what led to it, there can be no interference with it; but if, in putting it into form, it fails to express and stipulate for what the parties understood and intended it should, a case is made for a court of chancery."

*Smalley v. Rogers*, 232 Miss. 705, 712, 100 So. 2d 118 (1958) (quoting *Oliver v. Bd. of Supervisors*, 211 Miss. 447, 51 So. 2d 766, 769 (1951) (quoting *Hall v. State*, 69 Miss. 529, 13 So. 38, 39 (1891))).

¶58. This Court repeatedly has held "[f]indings of a chancellor will not be disturbed on review unless the chancellor was 'manifestly wrong, clearly erroneous, *or applied the wrong legal standard*.'" *Hotboxxx, LLC v. Gulfport*, 154 So. 3d 21, 24 (Miss. 2015) (citations omitted) (emphasis added). The Hancock County Chancery Court ruled that "Mr. and Mrs. Elchos knew, or should have known, that they were building such structure partially on their property and partially on the Haas property . . . ." On that basis, the chancellor granted the mandatory injunction sought by the Haases and ordered the Elchoses to remove their house from the Haases' property. But, apart from dismissing the Elchoses' counterclaims with prejudice, the chancellor altogether failed to analyze their request to have the property "re-surveyed and re-marked to allow [the Elchoses'] home to be located on the same size lot as the [Haases] intended to transfer." Nor did he analyze the affirmative defense of mutual mistake pled by the Elchoses.

29

¶59. The "knew or should have known" standard is not the correct standard in the context of reformation of a deed based on an allegation of mutual mistake. The plurality perpetuates this error. As noted above, however, equity contemplates a situation in which both parties are mistaken regarding a property description, even when the deed is clear and unambiguous. *See Smalley*, 100 So. 2d at 120.

¶60. Here, the Elchoses placed their new house on land they believed they had purchased from Haas. The record reflects that *Kevin Haas*, too, believed that the Elchoses were building their house on the lot which he had conveyed to them:

> Q: Did you ever go out on the ground and show my client where his lot was located?
>
> A: No. I showed him about where it was located.
>
> Q: And after my client, we'll just say, started with the foundation, up until you got a call regarding the Kleinekordt dirt issue, during all of that time, you never raised any issue with Mr. Elchos regarding possibly being on your lot?
>
> A: No, I did not.
>
> Q: *And did you believe his house was sitting on the lot you sold him?*
>
> A: *Yes.*
>
> Q: Where his house is sitting, is that the lot you intended to sell him?
>
> A: It's sitting on two lots.

(Emphasis added.) I agree with the Elchoses that this statement provides evidence beyond a reasonable doubt that both parties were mistaken about the location of the property. Thus,

30

Haas's own testimony supports that *both* parties to this contract were mistaken with regard to the exact location of the property conveyed by the Haases to the Elchoses.

¶61. Additionally, Kelly King testified that, when he was in the process of staking the property prior to laying the Elchoses' foundation, Kevin Haas showed King a "point of reference for elevation as to where we wanted to put the height of Mr. Elchos' foundation so he could have a starting point to go up with his second floor." Haas testified that, at that point, the foundation "was formed up" and that "I'm sure Kelly [had] put strings up there, but, I mean, I didn't go there to look for strings . . . ." When asked whether Haas ever had complained about the location of the property as staked out by King prior to or after the laying of the Elchoses' foundation, King responded that "he didn't say." Indeed, Haas himself testified: "I didn't know [the Elchoses' foundation] was on my property." The record is clear, from the testimony of Haas and others, that the Elchoses' foundation placement did not cause Haas alarm; he believed the structure to be on land he had sold to them.

¶62. Even if the Elchoses were charged with constructive knowledge of the location of their property based on the deed and the survey, it appears here that all parties to the contract of sale in 2004 understood the land the Elchoses staked out after the contract was signed constituted the subject matter of the contract. In these circumstances, because both parties were mistaken with respect to the location of the property, "an equity dehors the deed or instrument" arose, and reformation constituted the applicable remedy. *Brimm*, 80 So. at 381 (quoting *Simmons*, 11 Miss. at 71). Even if the deed and survey provided a clear description of the property conveyed, that description does not control under the longstanding precedent

of this Court if both parties are mistaken. *See Webb*, 404 So. 2d at 1031-32 (citing **Brimm**,80 So. at 381). Controlling the analysis is the intent of the parties: "what property the parties intended to have embraced in the description they used." **Brimm**, 80 So. at 381. In such an instance, reformation is the appropriate remedy: "the deed should be reformed to coincide with the description of the property intended to be conveyed." **Webb**, 404 So. 2d 1029, 1032.

¶63. The plurality says that "[t]he chancellor determined that the mistake was made by the Elchoses (unilaterally)." Plur. Op. ¶ 27. But the chancellor, whose sparse ruling stated only that "Mr. and Mrs. Elchos knew or should have known . . . ," did not, either in his bench ruling or in his written judgment, address the Elchoses' affirmative defense of mutual mistake. With respect to the learned chancellor, his limited analysis leaves the plurality to speculate regarding the impact upon the chancellor of the parties' arguments and the testimony adduced before him. But the evidence in the record strongly supports the occurrence of a mutual mistake.

¶64. The "knew or should have known" inquiry is not applicable to the facts of this case, and, in applying it, the chancellor erred as a matter of law. I would, therefore, reverse the decision of the chancellor and remand for the entry of a judgment reforming the Elchoses' deed to include the property they intended to purchase and Haas intended to sell.

¶65. The Elchoses' supplemental brief informed the Court that their house, which had been built, in part, on land belonging to the Haases, has been moved, in accordance with the mandatory injunction of the Chancery Court of Hancock County, onto the land described in their deed. The Haases acknowledge in their supplemental brief that the Elchoses' house "has

been moved so that the same is now located 100% on the property purchased by Mr. and Mrs. Elchos from Mr. and Mrs. Haas on May 18, 2004." In spite of having posted a *supersedeas* bond, the Elchoses did not request a stay pending appeal and it seems that the chancery court granted their motions to allow additional time in which to move the house. The Elchoses do not in the present matter seek damages for having been required to move their house wrongfully. Thus, the preceding opinion is purely hypothetical. At this time, if the deed were to be reformed as I suggest it should be, the Elchoses' house in its current location would be situated, in part, on the Haases' property. Nevertheless, I addressed the issue of reformation because I find that the Elchoses are entitled to attorneys' fees and costs, as discussed below.

> **2.      The record reflects that the doctrines of estoppel and laches barred the Haases' trespass claim.**

¶66.     The Elchoses assert on appeal, as they did in their answer, that the Haases' claims are barred by the equitable doctrines of estoppel and laches. The Haases respond that, since they did not know where the lot was located, "[t]here is no showing that Mr. and Mrs. Elchos changed their position [in] reliance on anything Haas did."

¶67.     "The defense of laches applies when one party neglects to assert a right or claim, and such neglect, when taken together with any lapses of time and other circumstances causing prejudice to the adverse party, operates as a bar in a court of equity." ***Bailey v. Estate of Kemp***, 955 So. 2d 777, 784 (Miss. 2007). The Court has articulated the standard for laches as follows:

> There is no hard and fast rule as to what constitutes laches. If there has been unreasonable delay in asserting claims or if, knowing his rights, a party does not seasonably avail himself of means at hand for their enforcement, but

suffers his adversary to incur expense or enter into obligations or otherwise change his position, or in any way by inaction lulls suspicion of his demands to the harm of the other, or if there has been actual or passive acquiescence in the performance of the act complained of, then equity will ordinarily refuse her aid for the establishment of an admitted right, especially if an injunction is asked. It would be contrary to equity and good conscience to enforce such rights when a defendant has been led to suppose by the word [or silence, or conduct] of the plaintiff that there was no objection to his operations.

*Hans v. Hans*, 482 So. 2d 1117, 1120 (Miss. 1986) (quoting *Twin States Realty Co. v. Kilpatrick*, 199 Miss. 545, 26 So. 2d 356, 358 (1946)). Stated differently, "[t]he party seeking to invoke the doctrine of laches must show: (1) [the existence of a] delay in asserting a right or claim, (2) [that] the delay was not excusable, and (3) [that] there was undue prejudice to the party against whom the claim [was] asserted." *Miss. Dep't of Human Servs. v. Molden*, 644 So. 2d 1230, 1233 (Miss. 1994) (citing *Allen v. Mayer*, 587 So. 2d 255, 260 (Miss. 1991)). "[T]he question of laches is addressed to the sound discretion of the chancellor and his decision will not be overturned on appeal except where there is an abuse of discretion." *Molden*, 644 So. 2d at 1233 (citing *Morgan v. Morgan*, 431 So. 2d 1119, 1121 (Miss. 1983)).

¶68. The present case is unlike *Turner v. Morris*, cited to this Court by the Haases and cited by the chancellor in his bench ruling, in which "the appellant [Turner] sought, but was denied in the Court below, an injunction directing the appellees [Morris and Hudson] to remove that part of their building covering this two by thirty foot strip of land owned by [Turner]." *Turner v. Morris*, 196 Miss. 297, 17 So. 2d 205, 206 (1944). This Court reversed the judgment and remanded, holding that "the appellees must be charged with knowing that their deed gave them no right to encroach on the appellant's land . . . ." *Id.* at 207. But in that

34

case, this Court found lacking any proof of laches: the claim that the appellant frequently saw the construction "was denied by the appellant," and even in the absence of the denial, "it falls short of proof that the appellant realized from what he saw when he was at or passing this building that it was being constructed so as to encroach on his land." *Id.*

¶69. Here, the weekend following the closing, the Elchoses marked the property lines with T-posts and string, according to their testimony. King, who laid the foundation for the Elchoses' home and who testified that he, too, had staked the property, testified that Haas had observed the placement of the foundation and the staked land surrounding it and that Haas had made no complaints. Haas's company assisted with the construction of a foundation for the Elchoses' home. Again, Haas said nothing. Haas attempted to straighten the Elchoses' damaged home after Hurricane Katrina. Again, he said nothing. Amid the Haases' silence, the Elchoses built a large house on the property, then, with Haas's assistance, repaired it after Hurricane Katrina. Haas's silent acquiescence to the Elchoses' construction of a house on land which belonged, in part, to Haas, and now his assertion that the Elchoses are trespassers and should be forced to remove their home, were not excusable and constitute undue prejudice to the Elchoses.

¶70. In the present case, ample evidence also supports a finding of estoppel. The case of *Martin v. Franklin*, cited to this Court by the Elchoses, demonstrates a situation similar to the present one. There, Franklin constructed his home on lands to which Martin later laid claim. *Martin v. Franklin*, 245 So. 2d 602, 604 (Miss. 1971). But, while all parties were present when the property was surveyed, Martin did not make a claim to the disputed portion

35

of the lot until Franklin's home had been completed. *Id.* This Court found that, "[w]ith full knowledge of his own title to the land in dispute, Martin stood by and saw the survey being made of the Franklin lot and later the construction by Franklin of a home thereon." *Id.* Because "Franklin acted in good faith believing he had title," the Court found that "Martin was under a duty to make known to Franklin the true state of the title when Franklin began making improvements on the lot." *Id.* As a result, this Court affirmed the chancellor's cancellation of "Martin's claim of title on the ground that Martin was estopped to assert his legal title." *Id.*

¶71. It was clear to Haas where the Elchoses thought their property was, since, at their direction, King had staked it out and laid the foundation. He knew where the actual property line was, since Fournet had marked the respective parcels according to instructions from Kevin Haas. The Haases' assertion that Kevin Haas was unaware that the Elchoses were building on his land simply is belied by the record: Kevin Haas directed Fournet to place the property lines in the manner which appeared on the survey. Even though he may not have known that the Elchoses were building, in part, on his land, and he could have believed that the lot upon which they built was the lot he had sold them, Haas had a duty to make known to the Elchoses his claim of title when the Elchoses began making significant improvements, as in *Martin*. Justice Coleman is correct that the landowner is charged with knowledge of his rights where he has "sufficient notice or means of knowledge." *Bright v. Michel*, 137 So. 2d 155, 159 (Miss. 1962). Here, the evidence plainly demonstrates that the Haases should have

36

known that the Elchoses were building their house on a piece of property, part of which was, in fact, owned by the Haases. The Haases, therefore, were estopped from claiming trespass.

¶72. Because the record before this Court demonstrates that the doctrines of estoppel and laches operated to bar the Haases' claim of trespass against the Elchoses, I would hold that the chancellor abused his discretion in not so finding.

### 3. The chancery court erred in awarding attorney's fees to the Haases.

¶73. Both parties requested attorney's fees at trial. The chancellor entered judgment in favor of the Haases for attorney's fees amounting to $15,928.75. The Elchoses assert on appeal that "Haas was awarded attorney's fees and costs as a result of the very Covenants he provided to Elchos" and that the chancellor erred as a matter of law in granting the award. The Haases claim that the award was warranted, since the Elchoses were guilty of "gross negligence" and they violated the protective covenants in the deed.

¶74. "[T]he matter of determining attorney's fees . . . is largely entrusted to the discretion of the chancellor." *A.M.L. v. J.W.L.*, 98 So. 3d 1001, 1022 (Miss. 2012) (quoting *O'Neill v. O'Neill*, 501 So. 2d 1117, 1119 (Miss. 1987)). "The standard of review regarding attorneys' fees is the abuse of discretion standard, and such awards must be supported by credible evidence." *Bailey v. Estate of Kemp*, 955 So. 2d 777, 787 (Miss. 2007) (quoting *Miss. Power & Light Co. v. Cook*, 832 So. 2d 474, 486 (Miss. 2002)).

¶75. Because I would reverse the chancellor's decision and remand for a reformation of the deed, I would vacate the chancellor's award of attorney's fees and costs to the Haases.

**WALLER, C.J., AND KING, J., JOIN THIS OPINION.**

37

**COLEMAN, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶76.    I agree with the excellent plurality opinion in all respects save one.  In my opinion, the chancellor considered the issue of estoppel under an erroneous legal standard.  The issue is subject to a *de novo* review on appeal, and given the myriad factual issues that must be considered, the case should be remanded for the chancellor to reconsider the issue under the proper legal standard.

¶77.    The chancellor addressed estoppel in his bench ruling holding that the doctrine of estoppel does not bar the Hasses' claim solely under ***Turner v. Morris***, 17 So. 2d 205 (1944).  The chancellor stated:

> In looking at the language of the case of Turner versus Morris, 17 So. 2d 205, the very last paragraph states – and there was an estoppel issue raised in that case -- "No estoppel appears therefrom even if knowledge by the appellant or conveyer of the encroachment without objection by him thereto would estop him from now complaining, in the light of the fact that the appellees or the buyers must be charged with knowledge that their deed gave them no right to encroach on the appellant's land."

I write because I am of the opinion that the statement of law from ***Turner*** upon which the chancellor relied constitutes an erroneous legal standard.  The strict reliance of the ***Turner*** Court upon the imputed knowledge of the deed in refusing to consider estoppel improperly changed the focus of future courts' attention from the person against whom estoppel would operate, and it placed a heavier burden – inconsistent with other pronouncements on the subject of equitable estoppel – on the party in whose favor estoppel would operate.

¶78.    The ***Turner*** Court determined that the evidence presented at trial "[fell] short of proof that [Turner] realized from what he saw when he was at or passing this building that it was

38

being constructed so as to encroach on his land." *Id.* at 207. The Court then held that, although it had just stated Turner was not on notice, it need not express an opinion on whether Turner was on notice because the Morrises must be charged with "knowing that their deed gave them no right to encroach on the appellant's land[.]" *Id.* at 207. In other words, the Court held that notice charged on a party by a deed *always* trumps whether the other party, the actual owner of the land, knew or should have known of the encroachment. Without precedent or caselaw support, the **Turner** Court changed the rule of equity and therefore created a tension, if not contradiction, within our caselaw that I believe should be clarified.

¶79. The Court has held:

> The rule of equity is, that if one man knowingly, though he does it passively by looking on, suffers another to purchase, and expend his money on land, under an erroneous opinion of title, without making known his claim, he should not afterwards be permitted to exercise his legal right against such person. It would be an act of fraud and injustice, and his conscience is bound by an equitable estoppel. **Dickson v. Green**, 24 Miss. R. 618, cited and confirmed.

*Nixon's Heirs v. Carco's Heirs*, 28 Miss. 414 (Miss. Err. & App. 1854). More recently, the Court has echoed a similar rule:

> If the owner of land with full knowledge, or with sufficient notice or means of knowledge, of his rights and of all the material facts, knowingly, though passively, looks on while another person expends money on the land under an erroneous opinion of title, it would be an injustice to permit the owner to exercise his legal rights against such other person. The owner is bound by the doctrine of equitable estoppel.

*Bright v. Michel*, 137 So. 2d 155, 159 (1962). Stated another way, the Court has held:

39

> [I]t is a rule of almost universal application that one who stands by and sees another purchase land or enter upon it under a claim of right and permits such other to make expenditures or improvements under circumstances which call for notice or protest cannot afterwards assert his own title against such person.

*Martin v. Franklin*, 245 So. 2d 602, 604-05 (Miss. 1971).

¶80. Although the Court recognizes estoppel by deed, estoppel by deed applies to the sale of land, and it estops a seller from claiming he sold anything different from what was denoted in the deed.[9] The rule of equitable estoppel, as denoted by *Nixon's Heirs*, *Bright*, and *Martin*, considers a different situation; it considers a situation where a property owner built a structure on land that he did not own. Equitable estoppel requires courts to consider the universe of facts undergirding the situation surrounding the construction of the structure. The rule supports the goal of determining whether a party "induce[d] another to act to his prejudice." *Perrien v. Mapp*, 374 So. 2d 794, 797 (Miss. 1979). In other words, the focus point of consideration is whether the party against whom equitable estoppel would be wielded acted in a manner which induced the party wielding it. Thus, I think that simply holding, as the *Turner* Court arguably did, that constructive notice imputed from a deed *always* precludes the application of equitable estoppel, is at odds with the goal and caselaw of equitable estoppel.

---

[9] An estoppel by deed is limited as follows:

> To constitute an estoppel by a deed, a distinct and precise assertion or admission of a fact is necessary. Hence, an estoppel by deed or similar Such estoppel should be certain to every intent.

*Cook v. Farley*, 15 So. 2d 352, 357 (Miss. 1943).

¶81. Of course, determining whether equitable estoppel applies is not a straightforward task. Chancellors must weigh the rule of equity with public-policy concerns.

> [O]wnership of property and the right to have it protected in the courts is so deeply embedded in the law that the denial of such right is always a matter of grave concern to the courts. The application of the doctrine of equitable estoppel [does] deny that right, and the doctrine should be applied cautiously and only when equity clearly requires it be done.

*Bright*, 137 So. 2d at 159. Thus, determining whether equitable estoppel applies is a fact-intensive analysis. *Id.* ("[E]very case of equitable estoppel *must* rest on the particular facts involved. The cases involving equitable estoppel vary as to the facts from case to case.").

¶82. The *Bright* Court concluded that, although the deed contained the correct property line, equitable estoppel applied. *Bright*, 137 So. 2d at 157, 159. It based its holding on the passivity of the Brights in watching and even helping the Michels build a structure that extended past the Michel property line, and on the lack of bad faith on the part of the Michels. *Id.* at 159. Under another fact-intensive analysis, the Court of Appeals held that equity required the sale of the disputed land at market price to the Pittses because they had built a garage on property owned by Cox, Inc. *David M. Cox, Inc. v. Pitts*, 29 So. 3d 795, 804 (¶21) (Miss. Ct. App. 2009). The holding was based on the following facts: the sales agent was a dual agent for both parties, the Pittses were not the experienced party but they were at fault for failing to have a survey formed, and Cox, Inc., had aided and watched the construction of the garage. *Id.* at 802-03 (¶¶ 16-20).

¶83. I would hold that *Turner* contradicts *Bright* and confuses our caselaw on equitable estoppel by overemphasizing one fact among the many to be considered. The *Bright* rule

41

correctly focuses the court's attention on the party against whom estoppel would operate. Under the instant facts, if estoppel applied, it would operate against the Haases. The chancellor failed to consider whether the Haases had "sufficient notice or means of knowledge" (that the Elchoses were building on their land) or whether the house was built under "circumstances which call for notice." Instead, the chancellor relied solely on *Turner*. *See Bright*, 137 So. 2d at 159; *Martin*, 245 So. 2d at 605.

¶84.    The chancellor failed to employ a fact-intensive analysis, as is appropriate for determining whether equitable estoppel applies, and there are many facts supporting a finding of equitable estoppel. It is undisputed that the Elchoses bought their land from Kevin Haas. Kevin Haas ordered the survey of the land prior to the sale of the land to the Elchoses. Testimony at trial established that Haas's trucking business – Haas Trucking – carried in the dirt used for the Elchoses' foundation. Haas also admitted that he saw the Elchoses' property after the foundation had been laid. Prior to completion of the house, Hurricane Katrina hit, and Haas then helped Perry Elchos push the house with an excavator to stand it back up. When the property-line dispute was first discovered about two years after Hurricane Katrina, Lori Elchos testified that Haas stopped by the Elchoses' house and told her, "Don't worry about it. We'll figure it out." Although the chancellor noted that the Haases believed the house was sitting on the Elchoses' property, and he found that the Haases did not discover the problem until 2007, whether estoppel applies should not hinge on whether the Haases

knew,[10] but on a fact-intensive analysis that determines whether the Haases had "*sufficient*

*notice or means of knowledge*." ***Bright***, 137 So. 2d at 159 (emphasis added).

¶85.    Since the application of equitable estoppel is a fact-intensive analysis, I would further

hold that the trial court is better equipped to make the determination.  Therefore, I would

remand for the chancellor to reconsider the issue of equitable estoppel in light of my instant

opinion and to reconsider the award of attorney fees pending his finding on equitable

estoppel.

       **DICKINSON, P.J., JOINS THIS OPINION.  LAMAR AND PIERCE, JJ., JOIN
THIS OPINION IN PART.**

---

[10]The plurality bases its holding on a factual determination that Haas had no actual knowledge that the Elchoses were building on his land, (Plur. Op. at ¶ 41), but as I point out here, actual knowledge is not the standard.  Rather, the question is whether Haas had sufficient means to know.